9 A.3d 582 (2010)
417 N.J. Super. 228
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
T.S., Defendant-Appellant.
New Jersey Division of Youth and Family Services, Plaintiff-Respondent,
v.
K.G., Defendant-Appellant.
In the Matter of the Guardianship of M.S., a minor.
Docket Nos. A-5902-08T3, A-5903-08T3
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2010.
Decided October 25, 2010.
*584 Mary Potter, Designated Counsel, argued the cause for appellant T.S. (Yvonne Smith Segars, Public Defender, attorney; Ms. Potter, on the brief).
Durrell Wachtler Ciccia, Designated Counsel, argued the cause for appellant K.G. (Yvonne Smith Segars, Public Defender, attorney; Ms. Ciccia, on the brief).
Geraldine O. Livengood, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Livengood, on the brief).
Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor M.S. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Devlin, on the brief).
Before Judges AXELRAD, R.B. COLEMAN[*] and LIHOTZ.
The opinion of the court was delivered by
LIHOTZ, J.A.D.
In these two appeals, calendared back-to-back and consolidated for the purpose of this opinion, we address challenges to a Family Part judgment terminating the parental rights of defendant K.G., the father, and defendant T.S., the mother, and awarding plaintiff the Division of Youth and Family Services (the Division) guardianship to effectuate the adoption of now twelve-year-old M.S. Each parent seeks reversal, arguing the Division failed to present clear and convincing evidence to sustain the judgment terminating parental rights.
*585 When the Division intervened and was granted custody, care and supervision of M.S., K.G. was incarcerated and T.S. was drug dependent and later faced criminal drug charges. During trial, held in March and April 2009, K.G. remained housed in Southern State Correctional Facility. T.S. had successfully completed drug rehabilitation and was compliant with all requirements of her probation; however, the court found the risk of her possible relapse remained high, and she was not sufficiently stable to care for M.S.
The Division reported that its initial goal of adoption by the resource family proved unworkable; nevertheless, it sought termination of parental rights with the prospect of locating a select home placement to secure M.S.'s adoption. Weighing the factual and expert evidence and relying on M.S.'s expressed desire not to see her mother, the court concluded the Division had proven all four statutory prongs, including that M.S. would not suffer more harm than good if parental rights were terminated.
Following trial, any expectation of a smooth passage was disrupted. Subsequent events, related in motions and during oral argument before us, have significantly shifted the landscape of this family's circumstances. Specifically, M.S. remains in a foster placement, which may present safety issues and has not been scrutinized by the court. T.S. continues her sobriety, is fully compliant with parole, remains employed and sustains adequate housing. Additionally, the child has changed her prior position and, now, expresses a desire to reconnect with her mother.
Following our review of the arguments presented by each parent, the Division and the Law Guardian, in light of the record and applicable law, we affirm the termination of parental rights as applied to K.G. However, as applied to T.S., we conclude the factual support underpinning the guardianship judgment has been sufficiently eroded that the judgment must be vacated and the matter remanded to the trial court for further review of the status of mother and child.
The facts taken from the trial record are generally undisputed. On December 4, 2006, the Paterson Police Department received a call from D.G. explaining she was M.S.'s aunt. The eight-year-old child had been left alone, outside, without a coat and her mother could not be contacted. The police referred D.G. to family court where she proceeded to seek an order of custody and was advised to contact the Division. D.G. spoke to Division caseworker Veronica Zeron and expressed her concern for M.S.'s safety because of T.S.'s drug use and inability to care for her daughter. D.G. also confided to the caseworker her belief that M.S. was protective and defensive of her mother. D.G. agreed she would care for M.S., if approved by the Division.
Zeron interviewed M.S. at school. The child appeared clean and healthy. She stated that, when her aunt found her, she was visiting her cousin's home and had a jacket but thought it had been stolen. Zeron noted the child was concerned her mother might go to jail. Zeron also recorded M.S.'s description of how her mother "[smokes] cigarettes and then goes to sleep."
That day, Zeron went to T.S.'s home, but was told she was unavailable. When Zeron returned the following day, T.S. answered the door, appearing disheveled, as if awakened. T.S. characterized D.G.'s account of events as "a lie" and mumbled that she was "going to beat the shit out of [D.G.]." During the interview, Zeron observed T.S. made no eye contact, displayed a flat affect, gave one-word answers that appeared delayed rather than spontaneous, *586 and actually dozed off. Zeron concluded T.S. was under the influence of drugs and conveyed the Division would seek an emergency removal of her daughter.
As Zeron reached her office, she received a telephone call from a school official stating T.S. had arrived, appeared to be under the influence of drugs, and was attempting to remove M.S. from school. Zeron traveled to the school to speak to T.S., who was adamant that M.S. not be placed with D.G. Zeron capitulated and agreed M.S. would be placed in foster care for the evening. Zeron's report substantiated T.S.'s drug dependence, which caused M.S. to be abused.
T.S. was referred for outpatient drug rehabilitation treatment, scheduled for a psychological evaluation and provided a visitation schedule (every other week for two hours). From December 2006 through June 2, 2007, T.S. tested positive for either marijuana, phencyclidine (PCP), or both, had difficulty abiding by the terms of the agency treatment agreements and displayed limited enthusiasm to actively engage in treatment. It is unnecessary to recite the varied treatment programs offered to T.S. Suffice it to say that one year after M.S.'s removal, T.S. displayed an overall unwillingness to tackle her addiction. She was repeatedly discharged from both outpatient and inpatient drug rehabilitation programs arranged by the Division because of poor attendance, behavioral concerns and lack of interest.
In April 2007, T.S. was arrested for possession of PCP, her first criminal offense. After a second arrest for a probation violation in February 2008, T.S. was granted admission to the county Drug Court program. At the child's request, T.S.'s visitation with M.S. was ordered suspended on May 30, 2008.
After she was removed from T.S.'s care, M.S. went to live with D.G. in December 2006. That placement was short-lived. The Division removed the child following the murder of D.G.'s brother in the room adjacent to M.S.'s bedroom. On January 10, 2007, M.S. was placed with the G. family. This placement lasted until January 2009, when the G.'s requested the child's removal.
At trial, the Division proposed a plan for M.S.'s adoption by a select home, although a specific adoptive family had not been identified. M.S. was temporarily staying with the A.'s, who had advised they were unable to adopt her. In June 2009, when the trial court rendered its opinion, the G.'s had reconsidered and M.S. was returned to their care with the expectation of adoption. Unfortunately, in January 2010, the G.'s again retracted their intention to adopt M.S. and requested her removal. M.S. finished the school year while living with the school nurse then returned, as a foster placement, to the A.'s home. Today, the A.'s are being considered by the Division as a prospective adoptive placement.
When M.S. was removed from her mother's care, the Division learned K.G. was the child's father. K.G. was incarcerated following a guilty plea and conviction for distributing a controlled dangerous substance within 1000 feet of a school zone. He was serving a five-year term, subject to a three-year period of parole ineligibility. The record contains little regarding K.G.'s relationship with M.S. A March 26, 2008 order required the Division to arrange telephone contact between K.G. and his daughter. Communication was later suspended pending a report from the child's counselor. K.G. declined to attend a mediation session held on July 11, 2008.
On September 17, 2008, K.G. offered Y.P., the mother of two of his children, as a placement resource for M.S. Division *587 caseworker Natalyah M. Cruz inquired whether M.S. knew Y.P. She apparently did not and M.S. expressed a desire not to be taken from her foster family, the G.'s. During an October 7, 2008 psychological evaluation by the Division's expert, Robert J. Miller, Ph.D., K.G. repeated his request that Y.P. care for M.S.
The Division proceeded to investigate K.G.'s request. Caseworker Tasha Manradge, f/n/a Tasha Westbrook, reviewed Y.P.'s background check and housing assessment. Although no identifiable problems were reported, the Division declined to place M.S. with Y.P. based upon the child's expressed desires not to be moved.
The Division's complaint for guardianship was filed on March 26, 2008. All contact between M.S. and her parents remained suspended pending a recommendation for its resumption by her therapist. The five-day trial commenced on March 23, 2009. The Division presented testimony from caseworkers Cruz and Manradge, who recounted the Division's involvement with the family. In addition to relating the factual circumstances causing placement and the services extended by the Division, the caseworkers repeated comments made by T.S. and M.S. during visits and interviews. For example, Manradge stated that on June 16, 2008, at a time when the child was not seeing her mother, M.S. said she wanted "five minutes with her mother to tell her that she wants her to leave her alone." Additionally, documents were moved into evidence including the Division contact sheets, progress reports, health evaluations, psychological assessments, counseling reports, drug screens, school records, medical and expert reports.
The Division advanced its proposal to pursue a select home adoption for M.S. through the testimony of Division supervisor Janet DaSilva. DaSilva discussed the Division's proposal, including the consideration that M.S. be returned to the G.'s. DaSilva expressed her confidence that despite her age, M.S. was an engaging child and would likely find adoptive parents. She explained the G.'s remained a possible placement because M.S. had expressed a desire to return to the G.'s "if they would have [her]." The Division had requested a psychological assessment to review the G.'s stability so as to explore all possibilities to locate a permanent stable home for M.S. DaSilva noted M.S. had vacillated in her desire to resume visits with T.S.
The Division also presented its expert, Dr. Miller, who had conducted psychological evaluations of T.S., K.G. and M.S., and performed bonding evaluations between M.S. and T.S., as well as with her then foster parents, the G.'s. Using psychological testing and clinical interviews, Dr. Miller assessed the parental capacity of the adults and the relational bonds each secured with M.S.
Dr. Miller stated T.S. was evasive, defensive and limited her responses during her evaluation, making his assessment difficult. He advised the greatest impediment to providing emotional nurturing and safe care for M.S. was T.S.'s longstanding habitual drug use over much of the child's life. Dr. Miller opined the history of T.S.'s drug involvement required "an established pattern of sobriety for a significant amount of time [and] to deal with underlying emotional issues[,] which would take a significant amount of time to address" before serious consideration of her resumption of the primary parental role can occur. Further, Dr. Miller believed T.S. was "at significant risk for relapse," decrying the notion she could provide a permanent stable home for M.S.
M.S. was described by Dr. Miller as having a positive self-image, confident disposition, and he found her funny and engaging. *588 M.S. demonstrated resilient behaviors towards her adversity  a "seeking out [of] competent people to help [her]"  as evinced by her positive school performance, cheerleading activities and friendships. However, he also observed signs of continuing anxiety and post-traumatic stress disorder suffered after viewing her dead uncle. Dr. Miller repeated his view that M.S.'s past emotional neglect caused a lack of trust in her relationships with adults, such that she believed she is "pretty much alone." He explained, in her caregiver relationships, M.S. viewed adults with an eye toward "what I can get, and I'm going to go for whatever I can get."
When discussing T.S., M.S. related her clear understanding of her mother's lack of competence as a parent. She acknowledged that her mother's drug addiction made her angry and sad. It also appeared M.S. exhibited parentification symptoms, as she was preoccupied with worry over T.S.'s well-being and remained protective of T.S. At the same time, she expressed her love for, and a desire to live with, her mother.
When Dr. Miller questioned M.S. about her father, she stated K.G.'s name "in a matter of fact way," and replied he was not in her life. Dr. Miller interviewed K.G., who offered no evidence he had ever provided M.S. with emotional or financial support. In short, all evidence revealed K.G. did not have, and had not had, a relationship with M.S.
During the bonding interview between mother and daughter, Dr. Miller observed T.S. was passive, failed to pickup M.S.'s facial cues, and lacked a desire to explore M.S.'s experiences. He determined T.S.'s personality flaws hampered her ability to properly parent, as she was unable to recognize M.S.'s needs.
In rendering his opinion, Dr. Miller was aware the G.'s had recently terminated M.S.'s foster placement, but he steadfastly maintained T.S. would not be a viable parent for M.S. Dr. Miller clarified his position, describing his view that M.S. was facing a crossroads:
she's at this place where she has been in an environment where risk factors were very high, protective factors very low, and she's been in that environment for some period of time. Now she's been in an environment where protective factors outweigh the risk factors. So we hope that those protective factors will in general pull her along an adaptive pathway.
. . . .
We want to keep the protective factors as high as possible for her for an extended period of time so that she can continue on this more adaptive pathway that she appears to be on.
Recognizing the G.'s broken placement heightened M.S.'s vulnerability, Dr. Miller nevertheless emphasized he would not recommend reunification with T.S., declaring:
I don't see any services whether substance abuse services, or parenting, or psychological services that would be in a time frame ... already, and remember [M.S.'s] time frame is going very quickly, I don't see anything, you know, it would be highly improbable that these  these kinds of services would have an effect to prepare her to be a parent, to provide safety, care, and emotional nurturance in the way [M.S.] needs at the current time.
Dr. Miller concluded T.S. needed to be drug-free, demonstrate consistent parenting over an extended period, and "de-center [her]self," that is, develop an ability to read M.S.'s emotions and place the child's needs ahead of her own.
T.S. presented the expert testimony of Barry Katz, Ph.D., who had performed a psychological assessment of her parenting *589 ability and evaluated her bond with M.S. Additionally, Dr. Katz evaluated the bond between the G.'s and M.S.
Dr. Katz opined T.S.'s satisfactory completion of drug rehabilitation, along with her commitment to sobriety for more than six months, made him "extremely confident" she removed the danger that had caused M.S.'s removal. His observation of mother and daughter revealed a strong bond and he recommended reunification subject to T.S.'s satisfactory completion of probation, continuing her sobriety and completion of a parenting skills class.
Dr. Katz was not surprised to learn the G.'s had requested M.S.'s removal. In the course of his evaluation, M.S. repeatedly expressed a fear the G.'s would reject her if she did not please them. Also, during the foster parent bonding examination, M.S. displayed rigidity: she sat away from the G.'s and there was no physical interaction such as hugging or holding hands, behaviors he had witnessed between the child and her mother. Dr. Katz opposed any suggestion of returning M.S. to the G.'s care, outlining the possible enduring psychological harm that would be suffered by M.S. if the G.'s again rejected her because she would not fully obey. He stated these "games of attachment," that is, "you have to be a better girl or else we are going to reject you again[,]" are inconsistent with stable parenting and demonstrate a severe problem in function.
Dr. Katz opined that the termination of T.S.'s parental rights would be "devastatingly harmful" to M.S. because T.S. was the child's primary caregiver. After being removed from her mother, then losing her foster placement, M.S. was psychologically fragile. If these events were followed by a permanent severing from her mother, the result would be "astronomically harmful."
T.S. testified on her own behalf, seeking reunification with her daughter. She described her compliance with the strictures of Drug Court, including attendance at rehabilitation three times each week, appearances before her probation officer, and complete abstinence from narcotics or alcohol since February 23, 2008. T.S. had obtained part-time employment at a fast-food restaurant, working twenty-six hours per week. She investigated a course for licensure as a certified nurse's aide and another for completion of her GED. In addition to attending narcotics anonymous meetings three evenings per week, she enrolled in parenting classes.
K.G. attended the trial. He, however, did not testify, present any witnesses or documentary evidence.
In a written opinion, the trial judge reviewed the evidence and made factual findings supporting each of the four prongs of N.J.S.A. 30:4C-15.1(a)(1) through (4), supporting his conclusion to terminate K.G.'s and T.S.'s parental rights. The court denied T.S.'s request for resumption of visitation. These appeals followed.
Our review is guided by certain basic principles. First, the scope of review of a trial court's decision to terminate parental rights is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472, 799 A.2d 518 (2002); see also In re Guardianship of Jordan, 336 N.J.Super. 270, 273, 764 A.2d 503 (App.Div.2001). We are obliged to accord deference to the trial judge's factual findings and credibility determinations respecting the judge's "feel of the case" based upon the opportunity to see and hear the witnesses. N.J. Div. of Youth & Family Servs. v. A.R.G., 361 N.J.Super. 46, 78, 824 A.2d 213 (App.Div.2003) (citing Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998)), aff'd in part and modified in part, 179 N.J. 264, 845 A.2d 106 (2004); see also N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J.Super. 235, *590 259, 867 A.2d 499 (App.Div.2005). Reversal is required only in those circumstances in which the trial court's findings were "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 914 A.2d 1265 (2007) (citations omitted).
Second, "[p]arents have a constitutionally protected, fundamental liberty interest in raising their biological children." In re Adoption of a Child by W.P. & M.P., 308 N.J.Super. 376, 382, 706 A.2d 198 (App.Div.1998) (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed. 2d 599, 606 (1982)), vacated on other grounds, 163 N.J. 158, 748 A.2d 515 (2000). "The Federal and State Constitutions protect the inviolability of the family unit." W.P. & M.P., supra, 308 N.J.Super. at 382, 706 A.2d 198 (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59 (1972)). However, government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979) (citing Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 1540, 32 L.Ed.2d 15, 33 (1972)). The State, as parens patriae, may sever the parent-child relationship to protect the child from serious physical and emotional injury. W.P. & M.P., supra, 308 N.J.Super. at 382, 706 A.2d 198.
When the child's biological parent resists termination of parental rights, it is the court's function to decide whether the parent can raise the child without causing harm. In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). The cornerstone of our inquiry is not whether the parent is fit, but whether the parent can "cease causing their child harm" and become fit to assume the parental role within time to meet the child's needs. Ibid. "The analysis ... entails strict standards to protect the statutory and constitutional rights of the natural parents." Ibid. "The burden rests on the party seeking to terminate parental rights `to demonstrate by clear and convincing evidence' that risk of `serious and lasting [future] harm to the child' is sufficiently great as to require severance of the parental ties." W.P. & M.P., supra, 308 N.J.Super. at 383, 706 A.2d 198 (quoting J.C., supra, 129 N.J. at 10, 608 A.2d 1312).
Third, the trial court's examination "focuses upon what course serves the `best interests' of the child." Ibid. The State Constitution and N.J.S.A. 30:4C-15 and 15.1(a) require satisfaction of the "best interests of the child" test by clear and convincing evidence before termination of parental rights can occur. See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 612, 512 A.2d 438 (1986); Jordan, supra, 336 N.J.Super. at 274, 764 A.2d 503. Specifically, the four-prong test set forth in N.J.S.A. 30:4C-15.1(a) requires the Division to prove:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family [formerly referred to as "foster"] parents would cause serious and enduring emotional or psychological harm to the child;
(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives *591 to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
See also In re Guardianship of K.H.O., 161 N.J. 337, 347-48, 736 A.2d 1246 (1999). These standards are neither discrete nor separate; they overlap to provide a composite picture of what may be necessary to advance the best interests of the children. Id. at 348, 736 A.2d 1246. "The considerations involved in determinations of parental fitness are `extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139, 631 A.2d 928 (1993)).
Our examination of this record discloses all four prongs of the best interests test have been met by clear and convincing evidence as applied to K.G. We reject as meritless K.G.'s argument that the judgment is against the weight of the trial evidence. R. 2:11-3(e)(1)(E). We add these brief comments.
K.G.'s challenge to the lack of services extended is rejected. K.G.'s incarceration has been concurrent with M.S.'s foster placement. Therefore, the Division was impeded by "`the difficulty and likely futility of providing services to a person in custody[.]'" N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J.Super. 576, 621, 914 A.2d 318 (App.Div.) (quoting N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J.Super. 525, 535-36, 889 A.2d 1120 (App.Div.2006)), certif. denied, 192 N.J. 68, 926 A.2d 853 (2007).
The primary reasons obviating the provision of services to K.G. were he had no relationship with M.S. and could not offer the child permanency. The court found K.G. had physically and financially abandoned M.S. He demonstrated no past parenting of or relationship with the child. Although M.S. knew her father's name, he otherwise was a stranger.
Further, this lack of a relationship between father and daughter could not be ameliorated by visitation or services because K.G. remained incarcerated throughout the litigation. K.G. proffered no evidence to challenge the court's findings and the record contains nothing to support even a possibility of K.G.'s availability and ability to safely provide for M.S.'s care in the near future. See L.A.S., supra, 134 N.J. at 139, 631 A.2d 928. (stating that "once a parent is imprisoned, a relationship with one's children that was nonexistent prior to incarceration will not likely be fostered").
Finally, K.G. never advanced a desire to assume the child's care. He supported T.S.'s efforts, at first, but then, almost a year later, offered the mother of his other children as a placement resource. On this record, we discern no basis to interfere with the June 10, 2009 judgment terminating K.G.'s parental rights.
With respect to T.S., we concur with the portion of the trial court's findings that the Division has satisfied the statute's first prong, showing the child's safety, health or development has been endangered by the parental relationship, N.J.S.A. 30:4C-15.1(a)(1), and third prong, requiring the Division to make "reasonable efforts" to assist the parent in correcting or eliminating the circumstances that caused the harm, N.J.S.A. 30:4C-15.1(a)(3). We conclude these prongs were sufficiently supported by clear and convincing evidence and we reject as without merit T.S.'s challenges to the evidence as insufficient. R. 2:11-3(e)(1)(E).
A more complex analysis is required when examining whether the termination of T.S.'s parental rights would cause M.S. more harm that good, in light of the *592 significant post-trial circumstances regarding M.S.'s pre-adoptive placement and T.S.'s rehabilitation efforts that displayed her ability to resume parenting. It is the State's evidence and the trial judge's findings as to the second and fourth prongs of the best interests standard that are at the heart of this case.
The second statutory prong contemplates parental unfitness and, for termination to occur, requires a conclusion that the parent is "unwilling or unable to eliminate the harm" that had initially endangered the child's health, safety and development. N.J.S.A. 30:4C-15.1(a)(2). The question is whether the parent can become fit in time to meet the needs of the child. J.C., supra, 129 N.J. at 10, 608 A.2d 1312. The Division must prove "the harm is likely to continue" as a direct result of the parent's inability or unwillingness to eliminate the harm. K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. Additionally, the potential future harm caused by a "delay of permanent placement" is also a consideration. N.J.S.A. 30:4C-15.1(a)(2).
When trial commenced, T.S. had examined educational opportunities, assumed part-time employment and continued appropriate housing. More important, she had successfully completed a drug rehabilitation program and had remained substance free for many months. T.S. suggested her past relapses resulted because she was not motivated to cease drug use, even though she was aware it posed the greatest barrier to reunification with her daughter. She expressed her motivation to comply with probation over the next two yeas and avoid any further criminal involvement. We applaud T.S.'s continued success and infer her motivation to remain substance free and aftercare compliant results from a desire to permanently change her life for the betterment of herself and M.S.
The trial court found T.S.'s past denial of drug dependence and delay in engaging rehabilitation efforts continued to harm M.S. by preventing her return. The trial judge properly viewed T.S.'s new found sobriety through a prism of the "duration, nature and extent of [her] habit." T.S.'s six months of abstinence, initiated only after arrest and completed "under the direct supervision of the criminal probation department," when weighed in the context of her thirteen-year drug dependence, was found "insufficient" to adequately address her drug problem. In doing so, the trial judge credited Dr. Miller and rejected the opinion of Dr. Katz.
Additionally, the trial court determined the risk of harm to M.S. caused by another removal, in the event of T.S.'s relapse following reunification, was too grave. The judge found "[t]he extended period of placement, the multiple placements and the experiences endured by the child have already caused significant harm ... and rendered her so vulnerable ... that placement with [T.S.] followed by another removal and placement would be `disastrous' for the child[,]" supporting a finding that the effects of guardianship would not do more harm than good. The court relied significantly upon M.S.'s expressed desires to accept adoption and no longer see her mother. Acknowledging M.S.'s sadness caused by her mother's failures, the judge concluded M.S.'s best interests were served by severing ties with her mother because it would allow the child "to move on" and secure a safe and stable permanent placement.
"[C]oncern has arisen for the best interests of children whose parents have forsaken their parental duties." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 505, 852 A.2d 1093 (2004) (internal quotations and citations omitted). The emphasis of the federal Adoption and Safe *593 Families Act of 1997 (ASFA), Pub.L. No. 105-89, 111 Stat. 2115 (codified as amendments in sections of 42 U.S.C.A.) "has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." N.J. Div. of Youth & Family Services v. C.S., 367 N.J.Super. 76, 111, 842 A.2d 215 (App.Div.), certif. denied, 180 N.J. 456, 852 A.2d 192 (2004); see N.J.S.A. 30:4C-15.
In our view, parents dabbling with addictive substances must accept the mandate to eliminate all substance abuse. Such unabated behavior initiates the foster care placement of their children and causes continuing harm by depriving their children of necessary stability and permanency. See P.P., supra, 180 N.J. at 510, 852 A.2d 1093; K.H.O., supra, 161 N.J. at 354, 736 A.2d 1246. As directed by ASFA, the amendments to Title 9, L. 1999, c. 53 § 1, and N.J.S.A. 30:4C, the delayed reunification, accompanied by the concomitant consequence of allowing the child's attachment to a resource caregiver continues the significant harm to the child in satisfaction of N.J.S.A. 30:4C-15.1(a)(2). See also P.P., supra, 180 N.J. at 507, 852 A.2d 1093 (concluding that when a child has significantly bonded to the child's parents, separation from them would in itself "cause serious and enduring emotional or psychological harm to the child," satisfying the statute).
Had no additional changes in these circumstances occurred, the court's determinations would likely withstand the rigors of our limited review. The Family Part judge's analysis based on the trial record displayed proper assessment of T.S.'s recent resumption of treatment following a year-long rejection of the Division's reunification efforts. Certainly we do not "`engage in an independent assessment of the evidence as if [we] were the court of first instance.'" N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J.Super. 427, 433, 798 A.2d 673 (App.Div.2002) (quoting State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999)). Reversal would only occur if we were convinced the trial judge's factual findings and legal conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Rova Farms Resort, Inc., v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974) (citation omitted).
Following trial, however, several issues arose. T.S. filed a certification in support of her request for visitation pending appeal. She explained how she and M.S. had remained in contact using cell phones and the internet. She was sober, continued to progress in the Drug Court program and maintained her employment. T.S. also learned M.S. may have experienced a sexual assault when first placed in the A.'s home. Division caseworker, Kelly Boehmer, certified to the trial court that "[t]he allegation that M.S. was victimized" by the A.'s nephew in their home "ha[d] been investigated by the Division and found to be without support[,]" but there "was an incident of inappropriate contact between [the A.'s] daughter and a nephew" and the nephew was moved from the A.'s home.
M.S. remained in the A.'s home following the incident with the A.'s nephew. Regrettably, disclosure from the Division suggests Boehmer's certification "misinterpreted the various statements by [M.S.], the nephew and the A.'s daughter." We understand this to mean Boehmer's certification was false. The Division now portrays the events as "an attempt at sexual assault by the A.'s nephew[,]" a comment allowing only speculation as to the actual experience. Because M.S. has again been placed with the A.'s, the question of whether *594 the A.'s can provide a safe placement is significant. Also, T.S. continues her objection to allowing her daughter to remain in the A.'s care.
At oral argument, in light of the recent events, the Law Guardian advised of a change in advocacy on behalf of M.S. Initially supporting the trial court's conclusion that severing parental rights was in M.S.'s best interests, he now advocated for a more guarded approach. The Law Guardian supported this request by noting T.S. had successfully remained drug-free for a considerable period of time, thus eliminating the most significant harm requiring M.S.'s removal. Additionally, the child had not secured a permanent placement. More significant, however, was M.S.'s newly expressed desire to see her mother. Consequently, the Law Guardian cautiously sought the opportunity to determine whether T.S. and M.S. should be reunited.
Unlike the trial judge, our review is aided by the benefit of time. No one disputes that a strong foster parent bond was not secured because of the G.'s change of heart. At trial, Division supervisor DaSilva explained adoption would not be considered until M.S. was in a new placement for at least six months. Consequently, the entry of a judgment of guardianship propelled M.S. to the uncertainty of being a legal orphan. Under that light, we carefully scrutinize the conclusion that M.S.'s best interests are served by giving her only the prospect of permanency.
When examining this issue, we remain mindful of the mandate of the statute's fourth prong, which is to determine "whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108, 952 A.2d 436 (2008). Prong four "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609, 926 A.2d 320 (2007). "[T]erminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." E.P., supra, 196 N.J. at 109, 952 A.2d 436. Here, the delicate balance is heightened as M.S.'s preadolescent age, the effects of past trauma and her immediate need for parental nurturing, social guidance and stability, allow only a narrow window of opportunity for success in either a reunification or adoption.
M.S.'s intellect and personality have allowed her to plainly recognize her mother's parental deficits and she was willing to accept foster parent adoption as a means of obtaining security. At an early age she recognized she most needed permanency  the undeniable goal of guardianship. See N.J.S.A. 9:3A-2(d). Because of her maturity, the Division and the trial court gave much weight to M.S.'s wishes to pursue adoption by the G.'s.
It has been "suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for ... a more promising relationship ... [in] the child's future." E.P., supra, 196 N.J. at 108, 952 A.2d 436 (quoting A.W., supra, 103 N.J. at 610, 512 A.2d 438). In the circumstances here presented, the termination of T.S.'s parental rights did not secure for M.S. a safe, loving home and the care of a stable adult who is intent on assuring the child's psychological and physical well-being. This goal must remain the focus of the State's intervention. Without an unwavering foster commitment, the termination of T.S.'s parental rights does not appear to afford an identifiable compensable benefit to the child.
*595 On the other hand, twelve-year-old M.S. retains an emotional bond with her mother, and T.S. steadfastly seeks the opportunity to resume the role of parent. M.S. who, in the past, seemed so sure she could live without her mother, has now strongly expressed a wish to resume their relationship.
It is unusual to have such a culmination of events, which when taken together, call into question whether the possible detriment posed by keeping the parent-child relationship intact is outweighed by the potential benefits of terminating T.S.'s parental rights. We are persuaded that these additional facts, although not present at the time of trial, must nevertheless be assessed before a conclusion can be drawn that termination will do more harm than good.
"The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., supra, 196 N.J. at 108, 952 A.2d 436 (quoting A.W., supra, 103 N.J. at 610, 512 A.2d 438). Following our review, we conclude it is in M.S.'s best interest to allow T.S. the chance to prove she has or can timely overcome identified parental shortcomings, much as she has overcome her drug addiction.
We do not intend to suggest that any and all post-trial changes warrant another look at the evidence presented at trial to support a final judgment terminating parental rights. We suggest only that there are instances when time does change everything. We are guided by the precept that "all doubts must be resolved against termination of parental rights," because of the sanctity that we accord parent-child relationships and because we recognize "that the severing of that relationship is among the most severe and irreversible forms of state action." E.P., supra, 196 N.J. at 102-03, 952 A.2d 436. (internal quotation and citations omitted).
We conclude the trial court must reexamine the current facts and determine whether the Division has met its burden to establish by clear and convincing evidence there were no alternatives to termination and termination will not do more harm than good.
We vacate the judgment of guardianship as to T.S. and remand the matter to the family court, to continue its supervision as the Division investigates the viability of reunification with an eye towards achieving a plan that satisfies M.S.'s best interests. In doing so, continued counseling to address M.S.'s needs pending a possible transition must also be secured. The court may consider exercising its discretion by interviewing M.S. as allowed by Rule 5:8-6, giving her the opportunity to express her opinion regarding reunification. E.P., supra, at 114, 952 A.2d 436.
Since we are not in a position to substantiate T.S.'s claims that she is now focused on the needs of, and challenges facing, her near-teenage daughter, we leave that role to the trial court. On remand, the assessment of T.S.'s current abilities should be made and, as necessary, specialized services designed to solidify her supportive relationship with her daughter should be identified and procured. Accordingly, the termination complaint may remain in effect as to T.S., so that if placement is not feasible, the Division may present further evidence as to the second and fourth statutory prongs to sustain its request for guardianship.
Affirmed in part, reversed in part and remanded for additional proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[*] Judge Coleman did not participate in oral argument. He joins the opinion with counsel's consent for the purpose of disposition.