# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0284-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.M.S.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.P.V. JR.,

    A Minor.

_____

        Submitted October 17, 2017 — Decided December 5, 2017

        Before Judges Yannotti, Leone, and Mawla.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Ocean County,
        Docket No. FG-15-0046-14.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Catherine Reid, Designated
        Counsel, on the brief).

        Christopher S. Porrino, Attorney General,
        attorney for respondent (Melissa H. Raksa,
        Assistant Attorney General, of counsel;

Christina Duclos, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian (Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

Defendant N.M.S. (Mother) appeals from an August 9, 2016 judgment entered by the Family Part, terminating her parental rights to C.P.V., Jr. (the child). She challenges only whether termination will not do more harm than good. We affirm.

I.

We summarize the facts set forth in the August 9, 2016 opinion of Judge Joseph L. Foster. In July 2007, the child was born to Mother and C.P.V., Sr. (Father).[1] Mother is an alcoholic with mental health issues. During her pregnancy with the child, Mother abused alcohol. As a result, the child was born prematurely with fetal alcohol syndrome and other special needs. The child was removed at birth and placed in custody of the Division of Youth and Family Services, since renamed the Division of Child Protection and Permanency (collectively "the Division"). After Mother

---

[1] Father was incarcerated when the child was born, and frequently thereafter. He surrendered his parental rights to the child, and has not appealed. Accordingly, we will discuss only Mother and the child.

received services and improved, the child was returned to her custody in May 2009.

Mother soon relapsed into alcohol abuse and stopped attending mental health services. In September 2011, the four-year-old child was found wandering the street while Mother was passed out drunk, and the Division removed the child for the second time. After Mother received services and improved, the child was returned to her custody in January 2013.

Mother again relapsed into alcohol abuse and stopped attending mental health services. In November 2013, the child had bruises and marks on his head after the six-year-old used scissors to cut his own hair, Mother was drinking in the home which was in deplorable condition, and the child was removed for the third time due to Mother's drinking and neglect.

In November 2014, Mother was drinking during visitation, tested positive for alcohol, and was arrested for DWI. She continued to abuse alcohol throughout 2015, and repeatedly failed to attend and comply with mental health services. She showed improvement in 2016.

At the 2016 guardianship trial, the Division's expert, Dr. David Brandwein, testified that Mother's alcohol abuse and mental health traits were "a veritable recipe for child neglect," that she had "a recurring pattern" of treatment and relapse, and that

she would relapse again and could not change. Dr. Brandwein testified that reunion with Mother followed by a fourth removal would cause the child "a psychological blow" that would "exceed his capacity for resiliency" and lead to a reaction from which the child "would most likely never recover." The trial court agreed that, given Mother's history, "[i]t would be inappropriate to risk the well-being of [the child] by accepting the pledge of [Mother] that this time [it would be] 'different.'"

Dr. Brandwein did three bonding evaluations with Mother and the child in 2014, 2015, and 2016. He found the initially strong, affectionate bond between them weakened significantly, with Mother becoming less engaged, the child more remote, and the bond less secure. The nine-year-old said he liked visits with Mother, but did not want to live with her. Dr. Brandwein testified that termination of their relationship would not result in enduring harm and could be addressed by counseling.

Dr. Brandwein opined that "the option that was going to be less harmful to [the child] would be to terminate [Mother's] parental rights and free him for select home adoption." The trial court agreed the harm of termination "pales in comparison to the 'intense psychological reaction that [the child] would experience if he were to remain in a state of limbo.'"

Throughout most of his three removals, the child resided with the same foster parent. In November 2015, he was removed from that foster parent after he stood on a younger child and threatened to stab the child. He was placed in a therapeutic treatment home to address his special needs.

The Division's adoption specialist, Christen Clayton, described the child as "a lovely little boy" with many qualities which would help him get adopted. She testified the Division's plan was select home adoption followed by location of a permanent adoption family. She testified termination would increase the child's adoptability because once a child is legally free for adoption, the child can be registered on state and national exchanges, can attend match events, and can be adopted in other states and in several additional homes in New Jersey. She testified that recently children with similar or worse concerns had been adopted. Both she and caseworker Mary Campbell testified they were confident the Division would be able to find a permanent adoptive home for the child.

During trial, the child was moved from one therapeutic home to another after the eight-year-old scratched and threatened to kill a younger child. Campbell testified she still believed Mother's rights should be terminated so the child could be adopted.

The trial court found Mother's "persistent history of substance abuse, relapse, and failure to adequately address her mental instability . . . had caused [the child] to suffer profound harm." As a result, the child had spent "approximately two-thirds of his life in the custody of the Division." Mother was "unable to and unwilling to eliminate the harm" and "to provide a safe and stable home for" the child and "the delay in permanent placement will add to the harm." The Division made more than reasonable efforts, providing Mother long- and short-term inpatient and intensive outpatient substance abuse programs, Alcoholic Anonymous, mental health programs, and other services.

In considering the fourth prong, the trial court recognized "[t]he difficulty here is that [the child] has not been placed in a home which is committed to adopting him." The court credited Dr. Brandwein, Clayton, and Campbell, and found that "termination of parental rights will give [the child] his last best chance for having permanency in his life and will do more good than harm." The court ordered the termination of parental rights.

The trial court found termination of Mother's parental rights was in the best interests of the child and was supported by each prong of the four-prong test outlined in N.J.S.A. 30:4C-15.1(a). Mother appeals the decision of the trial court, arguing that clear and convincing evidence does not support a finding that termination

will do more harm than good under the fourth prong of <u>N.J.S.A.</u> 30:4C-15.1(a).

II.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." <u>In re Guardianship of K.H.O.</u>, 161 <u>N.J.</u> 337, 346 (1999). However, this protection "is tempered by the State's <u>parens patriae</u> responsibility to protect the welfare of children." <u>Id.</u> at 347; <u>see</u> <u>N.J.S.A.</u> 30:4C-1(a).

Under Title Thirty, the Division must prove by clear and convincing evidence that termination of parental rights is in the best interests of the child. <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 <u>N.J.</u> 420, 447 (2012); <u>see</u> <u>N.J.S.A.</u> 30:4C-15(c). The Division must show that:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or in unable or unwilling to provide a safe and stable home for the child and the delay of permanent will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has

7

considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"Appellate review of a trial court's decision to terminate parental rights is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We must determine whether the court's decision "is supported by 'substantial and credible evidence on the record.'" F.M., supra, 211 N.J. at 448. "We ordinarily defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth Servs. v. E.P., 196 N.J. 88, 104 (2008). "Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Thus, "[w]e will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." F.M., supra, 211 N.J. at 448 (citations omitted). We must hew to our deferential standard of review.

On appeal, Mother challenges only the trial court's finding on the fourth prong.  Applying our standard of review, we affirm substantially for the reasons given in the opinion of Judge Foster on August 9, 2016.  We add the following.

III.

The fourth prong "serves as a fail-safe against termination even where the remaining standards have been met."  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007).  "[T]he fourth prong of the test for terminating parental rights requires that [the Division] prove by clear and convincing evidence that '[t]ermination of parental rights will not do more harm than good.'"  N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 180-81 (2010) (quoting N.J.S.A. 30:4C-15.1(a)(4)).

Normally, "[t]he question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from permanent disruption of [his] relationship with [his] foster parents."  Id. at 181 (citation omitted).  "The 'good' done to a child in such cases in which reunification is improbable is permanent placement with a loving family."  E.P., supra, 196 N.J. at 108.

However, where the child has no foster parent waiting to take custody of the child, the question is "whether a child's interest

will best be served by completely terminating the child's relationship with that parent." Id. at 108. In that situation, one potential good is that termination will increase the child's availability or opportunity for permanent placement.

In the seminal case of N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591 (1986), our Supreme Court articulated the four-prong test later codified in N.J.S.A. 30:4C-15.1(a). Regarding the fourth prong, the Court noted, "[s]ome have suggested that '[a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future[.]'" Id. at 610 (quoting Orman W. Ketcham & Richard F. Babcock, Jr., Statutory Standards for the Involuntary Termination of Parental Rights, 29 Rutgers L. Rev. 530, 542-43 (1976)) (alterations in original). "Indeed, the detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place." Id. at 611 (quoting In re Angelia P., 623 P.2d 198, 210 (1981) (Bird, C.J., concurring and dissenting)).

The Supreme Court in A.W. did not forbid termination when the Division has not yet formulated a permanency plan distinguishing a person willing and able to adopt the child. Rather, it

10

instructed that, because a "child deeply needs association with a nurturing adult," and "permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life" and "consider the permanency plan." Id. at 610.

Moreover, the Supreme Court recognized "there will be circumstances when the termination of parental rights must precede the permanency plan. A multiply-handicapped child or a young adolescent might not be adoptable at the time of the termination proceedings." Id. at 611. Here, the child has special needs and behavioral issues that complicate his adoption. Nonetheless, the child was able to live successfully for the better part of six years with a foster mother intending to adopt until difficulties arose. The Court in A.W. also recognized that difficulties with foster parents and unsuccessful placements "are the inevitable consequence of temporary living arrangements." Id. at 614.

The Supreme Court returned to this issue in E.P. The Court reiterated A.W.'s concern that "terminating parental rights without any compensable benefit, such as adoption, may do great harm to a child." E.P., supra, 196 N.J. at 108 (citing A.W., supra, 103 N.J. at 610-11). The Court noted literature stating that "too many children 'freed up' for adoption do not in the end find permanent homes." Id. at 109 (quoting In re Guardianship of J.C., 120 N.J. 1, 21 (1992) (quoting Robert Borgman, Antecedents

and Consequences of Parental Rights Termination for Abused and Neglected Children, 60 Child Welfare 391, 392, 402 (1981))).

"In the unique circumstances" of E.P., the Supreme Court ruled the "parent-child relationship that continued to provide emotional sustenance to [E.P.'s] child should not have been severed based on the unlikely promise of a permanent adoptive home." Id. at 114. Those unique circumstances are not present here. Judge Foster's opinion sets forth numerous key factual differences that distinguish E.P. from this case, including the much stronger relationship between E.P. and her daughter Andrea, and Andrea's desperate, near-suicidal opposition to adoption.

We note additional differences which further distinguish E.P. First, E.P. and Andrea had never been reunited, and Andrea and the law guardian fervently sought reunification. Id. at 93-96, 106. Here, there have been two failed reunifications, the child in the final evaluation did not want reunification, and the Law Guardian supports termination of Mother's parental rights. "[T]he Law Guardian's position [is] of particular significance because . . . she has to advocate for the best interests of the child too young to speak for himself, and represents neither adversary in the case." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 433 (App. Div. 2009).

Second, in E.P., the family court found "that completely severing the mother-daughter ties would be 'extremely painful' and even 'devastating' to Andrea." E.P., supra, 196 N.J. at 110. Here, the trial court credited Dr. Brandwein's testimony that termination "'would not have an enduring impact on'" the child, and that it was reunification followed by "the 'inevitable' fourth removal [which] 'would be psychological devastating' to" the child.

Third, in E.P., the Division's adoption specialist testified "older foster children are more difficult to place," the family court found it was "highly questionable" that Andrea would ever find a permanent home with a foster family, and the Supreme Court stressed Andrea was almost thirteen years old. Id. at 98, 109-10. Here, there was no such testimony or finding, and the child was only nine-years-old at the time of the trial.

Next, Mother points out that Dr. Brandwein and adoption specialist Clayton testified before the child scratched and threatened to kill a younger child. Mother argues that Dr. Brandwein and Clayton may have altered their optimistic testimony in light of the child's new violent incident.

However, the child had stood on and threatened to stab a younger child before Dr. Brandwein and Clayton testified, and they nonetheless testified the best course was termination for

13

adoption, preferably by a foster parent with no younger children. The child's second outburst was inconsistent with Clayton's view "that he was no longer displaying aggressive conduct," but it did not necessarily change the remainder of their testimony. Mother did not seek to recall Clayton (or Dr. Brandwein) to see if it would change the testimony that the nine-year-old could be adopted. Instead, Mother merely speculates Clayton's testimony (and Dr. Brandwein's) "might well have been tempered." Such speculation is not evidence.

Indeed, when caseworker Campbell was recalled after the scratching incident, she reiterated her belief it was in the best interests of the child to terminate parental rights and seek adoption. The trial court properly could rely on her testimony.

In any event, the trial court, which was well aware of the scratching incident, nevertheless choose to credit the prior testimony from Clayton and Dr. Brandwein. "[R]eviewing courts should defer to the trial court's credibility determinations." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). That testimony, together with the testimony of Campbell and others, provided clear and convincing evidence supporting termination. "Applying our limited standard of review to the careful judgment that the trial court fairly exercised in weighing the fact-sensitive considerations here under the fourth prong,"

14                                                      A-0284-16T3

we see no reason to upset the court's determination. <u>N.J. Div.</u> <u>of Youth & Family Servs. v. J.S.</u>, 433 <u>N.J. Super.</u> 69, 93 (App. Div. 2013) (citing <u>J.N.H.</u>, <u>supra</u>, 172 <u>N.J.</u> at 472).

Mother also argues the trial court incorrectly weighed the harm of termination against the harm of reunification. Mother notes that a decision to decline to terminate parental rights does not mean Mother will be reunified with the child. Mother points out that the court must balance the harm of termination against the increased prospect of adoption.

However, we see no indication the court did not perform that balancing. Mother points to its quotation of Dr. Brandwein's testimony about the devastating harm from another failed reunification and removal, but that harm was a valid consideration for both the expert and the court. In the end, the court properly found that there was clear and convincing evidence that termination would not do more harm than the good of freeing the child for adoption.

Lastly, Mother argues this case should be remanded, like <u>E.P.</u>, <u>supra</u>. However, the Court remanded in <u>E.P.</u> solely "[b]ased on a failure of proof on prong four." <u>Supra</u>, 196 <u>N.J.</u> at 111.

A-0284-16T3

Here, unlike E.P., we have found no such failure.[2] Moreover, as set forth above, this case is unlike E.P. In particular, E.P. had an "unlikely possibility of permanency in the future." Ibid. Here, the trial court found the child has an opportunity for adoption, particularly once termination makes the child free for adoption. An unjustified remand would only delay and impede the child's opportunity.

To support remand, Mother cites N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228 (App. Div. 2010). However, there we vacated and remanded because of "unusual" and "significant post-trial circumstances," namely post-trial progress by M.S.'s mother; M.S.'s new, strong desire to see her mother; an attempted sexual assault against M.S. "in [her] foster placement, which may present safety issues and has not been scrutinized by the court," and a change in position by M.S.'s law guardian based largely on those new developments. Id. at 232, 243, 246-49. No such post-trial developments have occurred here.

We noted in T.S., "[a]dditionally, the child had not secured a permanent placement," but we stated that was less significant than M.S.'s change in position. Id. at 247. We did not imply

---

[2] Nor did the trial court "rel[y] on inappropriate factors in reaching its determination," the basis for remand in A.W., supra, 103 N.J. at 617 (reversing the denial of termination and remanding for "reconsider[ation] by a new fact-finder").

delay in a permanent placement alone would justify remand.  See id. at 249 ("We do not intend to suggest that any and all post-trial changes warrant another look at the evidence presented at trial to support a final judgment terminating parental rights."). Here, even assuming such delay has occurred, it is not a basis to vacate a valid judgment.  Cf. J.N.H., supra, 172 N.J. at 479 (remanding because the family court had insufficient evidence to decide a Rule 4:50 motion).

Mother argues postponing termination would allow her to have contact with the child while he awaits adoption.[3]  However, Dr. Brandwein testified "the course of action that would be the most harm for [the child] is keeping him in limbo" without freeing him for adoption.  After nine years, three failed reunifications, and a fourth removal three years ago, the child has been in limbo long enough.  See N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) ("'Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law.'" (citation omitted)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] We note the trial court denied Mother's request for visitation pending appeal.