# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3119-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.D.,

      Defendant,

and

A.P.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.P.,
a minor.

_____

Submitted February 8, 2021 – Decided March 26, 2021

Before Judges Suter and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0029-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth Harrigan, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Rachel B. Kristol, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo Hirsch, Designated Counsel, on the brief).

PER CURIAM

Defendant, A.P. (Adam or defendant)[1] appeals the judgment terminating his parental rights to N.P. (Nick). He contends the trial court lacked substantial, credible evidence to terminate his parental rights.[2] We affirm largely for reasons expressed in Judge Michael Antoniewicz's comprehensive, written opinion.

---

[1] Fictitious names have been used throughout the opinion to maintain the confidentiality of the parties.

[2] J.D. (Jane) voluntarily surrendered her parental rights to Nick in December 2019. She is not involved in this appeal. Jane has an adult daughter, who also is not part of this appeal, although she is referenced in the opinion.

## I.

Defendant is the biological parent of Nick, who was born in May 2014. In 2016, a referral was made to the Division of Child Protection and Permanency (DCPP) because Jane's fifteen-year-old daughter, Audrey, was not attending school. Adam acknowledged smoking marijuana with Audrey and that his substance and alcohol abuse were not treated. DCPP also received a second referral about the family. It claimed that after Adam was released from jail for domestic violence against Jane, he followed the family to the shelter where they were living, and that he was homeless.

The DCPP implemented a safety protection plan, but Adam violated it by having unsupervised contact with Nick. The court then placed the children under DCPP's care and supervision, and required services that included substance abuse treatment, a psychological evaluation, and supervised visits with Nick.

In March 2016, Dr. Jemour Maddux conducted a psychological evaluation of Adam, recommending a psychiatric evaluation, therapy and domestic violence counseling. Defendant's substance abuse evaluation recommended he participate in intensive outpatient treatment. He was referred to domestic violence counselling because of a history of domestic violence in

3

his relationship with Jane. Defendant did not comply with his drug treatment program through lack of attendance and was discharged. Defendant maintained supervised visitation with Nick. In December 2016, the DCPP learned Adam was not compliant with the domestic violence program's payment policy, and that he was discharged. Adam explained he used his money to pay for Jane and the children.

In December 2016, the caseworker took Adam to social services to apply for assistance. He remained homeless. He attended monthly psychiatric care for a bipolar disorder, alcohol and cannabis use. The litigation was terminated in May 2017, when the family lost contact with DCPP.

In June 2017, Adam was arrested for burglary. Audrey, who by then was seventeen, was with Adam when he was arrested. DCPP executed an emergency removal of the children, and obtained an order placing Nick and Audrey under its care, custody and supervision. Nick was placed with the resource family where he currently lives. Defendant explained to DCPP that he was stealing pipes from buildings to support his family. He was not attending a substance abuse program or a program for his mental health issues.

DCPP learned that defendant had a sister and brother-in-law, S.H. and P.H., in Ohio who could be evaluated for possible placement of the children.

A-3119-19

By this time, defendant had attended an inpatient drug treatment program, was residing in a shelter and participating in Drug Court. He was to attend intensive outpatient treatment.

Dr. Maddux conducted another evaluation of Adam in November 2017. He recommended individual psychotherapy for a bipolar disorder, medication monitoring, compliance with substance abuse recommendations, domestic violence counselling, supervised visitation, and a continuation of restraints until Adam could meet certain benchmarks.

Jane and Adam were living in a shelter at that time, but they were discharged when it was alleged Adam assaulted Jane. Because Adam remained homeless, DCPP referred him to a program that included therapy but had a housing component.

In January 2018, Adam was arrested for violating his probation by not attending substance abuse treatment. DCPP advised defendant to apply for temporary rental assistance from the county because he already was receiving other welfare assistance. When he was released, he stayed at a shelter. DCPP restarted his supervised visitation with Nick. DCPP provided defendant with a list of housing resources. By September 2018, Adam completed outpatient services, was employed, taking medication and compliant with Drug Court.

A-3119-19

Two months earlier, the trial court approved DCPP's plan to terminate Jane and Adam's parental rights to Nick. The guardianship complaint was filed in July 2018.

Between October and November of 2018, Adam, Jane, Nick, and S.H. and P.H. submitted to psychological evaluations with Dr. Elizabeth Smith. Her report stated, "it is my opinion, to a reasonable degree of psychological certainty, that neither [Adam nor Jane] would be able to safely parent [Nick] in the foreseeable future." "This is due to chronic and severe mental illness, substance abuse and personality disorders." She opined that placing Nick with his aunt and uncle in Ohio would not "cause severe and enduring harm."

Dr. Mark Singer conducted a combined psychological and bonding evaluation for the Law Guardian. He concluded that neither parent was "likely to become a viable parenting option for their child in the foreseeable future." He continued that they would continue to "struggle" with substance abuse and that they "will continue to have significant difficulty" attaining or maintaining stability for Nick. These patterns were likely to persist. He also concluded that termination of parental rights was in Nick's best interest.

In April 2019, Adam and Jane agreed to identified surrenders of their parental rights to Nick in favor of S.H. and P.H., who lived in Ohio. Nick was

6

placed in their custody. By August 2019, however, these paternal relatives advised they did not want to adopt Nick. The identified surrenders were vacated, and the termination of parental rights litigation was reinstated. Nick was returned to New Jersey to the resource family where he resided since his removal in June 2017. The DCPP reinstituted services for Adam.

By this time, Adam advised DPCC that he had housing and was employed. He resumed visitation with Nick. However, in the fall of 2019, he was fired from his job which also meant that he lost his housing. He then did not maintain his visits with Nick, and by October 2019, a warrant was issued for his arrest because he did not appear in Drug Court. Adam was arrested and incarcerated during the trial. Adam's substance abuse treatment provider advised DCPP about Adam's poor compliance with the program.

In the termination of parental rights trial, the DCPP case worker testified about the DCPP's involvement with the family beginning in 2016 when Nick was two years old. The case worker testified it was DCPP's plan for Nick to be adopted by his current resource family.

Dr. Smith testified for the DCPP about the psychological and bonding reports she prepared following her evaluations of Adam in 2018 and 2019. Dr. Smith testified that Adam exhibited a personality disorder and suffered from

7 <span>A-3119-19</span>

bipolar and substance abuse disorders. His mental health seemed to have deteriorated. He had an abusive relationship with Jane. Dr. Smith testified Adam could not safely parent Nick and could not do so into the foreseeable future. He minimized his behavior and remained unstable. He exhibited a demeanor that was grandiose with poor judgment. He minimized his substance abuse history. She had "no confidence" that he could remain sober. Even though he had three years of services, Dr. Smith did not think Adam had eliminated the harms that resulted in Nick's removal. He could not safely parent Nick or provide a safe home for him. There were no additional services she could recommend.

Dr. Smith testified that Nick had "multiple attachments." Nick's primary attachment was to his resource parents, not to Adam. They were "very happy and comfortable together." His bond with the resource parents was "very strong and secure." She opined it was in Nick's best interest to terminate Adam's parental rights in order that Nick could be adopted by his resource parents.

Dr. Mark Singer testified for the Law Guardian that Adam did not take responsibility for his behavior. He was homeless and without employment. He exercised poor judgment by smoking marijuana with Jane's daughter, who

was a minor at the time. He suffered from a bipolar disorder. Dr. Singer described Adam's "overall behavioral pattern" as showing "times of compliance . . . and then there are behaviors involving poor judgment where he sabotages himself." Dr. Singer opined that Adam could not adequately parent Nick because of these "patterns of instability" and would not be able to do so in the future. Adam still had no plan for Nick's future.

Dr. Singer's bonding evaluation showed it was in Nick's best interest to "achieve consistency and permanency." Adam could not provide this. He testified it was in Nick's best interest to terminate Adam's parental rights followed by Nick's adoption by the resource parents. Although Nick would have a negative reaction from termination of Adams' rights, that relationship already was disrupted by incarceration, and the resource parents could mitigate that harm.

Defendant did not attend his bonding re-evaluation in the fall of 2019 with Dr. Singer. After that, Adam became incarcerated. The jail did not permit personal contact between Adam or Nick. Dr. Singer testified it would not be fair to Nick or Adam to conduct a reevaluation under these circumstances.

A-3119-19

Adam's testimony revealed he did not take responsibility for what had occurred. He explained that he could not start drug treatment in 2016 because he was working. He could not finish the domestic violence counselling because he gave his money to Jane and could not afford the five-dollar fee. He did not have housing because he was scammed. He was arrested in June 2017, but there was no evidence against him. He pleaded guilty to burglary so Audrey would not be charged. He was falsely accused of assaulting Jane and discharged from the shelter. He could not get drug treatment because he was homeless, and that was a violation of probation and then he was arrested. At some point, he tested positive for marijuana because smoke had been blown in his face. His employer fired him. He then lost his housing when the employer backed out of a business arrangement with him. When he lost his job, Adam explained he was stealing pipes from buildings for money. He did not have a plan to take care of Nick if he were released, which would require Nick to remain in foster care for a time.

On March 20, 2020, the trial court ordered termination of Adam's parental rights to Nick. In its comprehensive, written decision, the trial court found there was clear and convincing evidence to support each of the four prongs of the best interests test under N.J.S.A. 30:4C-15.1. The trial court

10

credited the testimony of witnesses for DCPP and the Law Guardian. It did not find Adam to be a credible witness.

The court found Adam "would endanger the safety, health and development " of Nick. Adam had not addressed the issues which had led to Nick's removal: substance abuse, lack of housing, lack of stability, and mental health issues. Nick was exposed to domestic violence. The trial court found prong two was satisfied because Adam did not address the underlying problems or take responsibility for them. The experts testified Adam would not be capable of parenting Nick in the foreseeable future. The court found the DCPP provided reasonable services in satisfaction of prong three. The fourth prong was satisfied based on the expert testimony that termination would not do more harm than good. The court found Nick was securely bonded with his resource parents; they are Nick's psychological parents. The child would suffer "a traumatic loss and extreme distress if removed from his [r]esource [p]arents."

On appeal, defendant raises these issues for our consideration:

POINT I

THE TRIAL JUDGE ERRED IN HIS DETERMINATION THAT DCPP SATISFIED THE REASONABLE EFFORTS STANDARD WHERE DCPP FAILED TO PROVIDE SERVICES THAT

WERE REASONABLE UNDER ALL THE CIRCUMSTANCES.

POINT II

REVERSAL IS WARRANTED BECAUSE THE EVIDENCE PRESENTED DID NOT SUPPORT THE LOWER COURT'S CONCLUSION THAT NICK'S SAFETY, HEALTH, OR DEVELOPMENT WAS OR WILL CONTINUE TO BE ENDANGERED BY THE PARENTAL RELATIONSHIP.

POINT III

THE COURT'S CONCLUSIONS THAT ADAM WAS UNABLE OR UNWILLING TO ELIMINATE THE HARM FACING HIS CHILD AND UNWILLING OR UNABLE TO PROVIDE A SAFE AND STABLE HOME ENVIRONMENT WERE ERRONEOUS.

POINT IV

REVERSAL IS WARRANTED BECAUSE THE EVIDENCE PRESENTED DID NOT SUPPORT THE LOWER COURT'S CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD.

II.

To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires that the

Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm . . . ;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

We have carefully examined the record in light of the arguments posed, concluding that Judge Antoniewicz's findings were supported by substantial, credible evidence on the record as a whole. We defer to those findings. See

13

N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012);

Cesare, 154 N.J. at 413. We affirm substantially for the reasons set forth by

the trial court in its written decision, adding these comments.


A.

Defendant contends the DCPP did not make reasonable efforts to

provide appropriate services to meet his needs. He argues he was not given

visitation with Nick during his incarceration and Dr. Singer did not update his

bonding evaluation. Adam claims DCPP did not help him find housing. He

argues he was not referred to programs that would have helped him with

employment and a better education.

The third prong[3] of N.J.S.A. 30:4C-15.1(a) requires the State to make

reasonable efforts to help a parent correct the circumstances that led to the

child's outside placement by providing services. N.J.S.A. 30:4C-15.1(a)(3).

Reasonable efforts must consider "the abilities and mental conditions of the

parents." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418,

442 (App. Div. 2001).

---

[3] We address the statutory factors in the same order they were addressed by
defendant.

A-3119-19

There was substantial credible evidence to support the trial court's finding that the third prong was proven by clear and convincing evidence. The DCPP provided a host of services to Adam consisting of substance abuse evaluations and treatment, domestic violence counselling, medication monitoring and counseling, the referral to programs that included a housing component, referral to public assistance, supervised visitation with Nick, psychological evaluations, and counselling. All these services were implemented based on the psychological evaluations and testing conducted by DCPP's experts. The DCPP also identified relatives who might be able to adopt Nick, but the placement in Ohio with Adam's sister did not work out and the child was returned to New Jersey. There were no other options.

Adam did not attend the updated bonding evaluation in November 2019. After that, he was incarcerated but the jail did not permit in-person contacts. Dr. Singer testified that visitation under these circumstances would not be fair to Adam or his son. Dr. Smith was able to update her evaluations, however, this was before Adam was incarcerated. She testified to the updated evaluations. There was no expert testimony offered by the defense to rebut the opinions by Drs. Smith and Singer. The fact that Adam may not have been

15

successful in overcoming the problems that resulted in Nick's removal does not mean the DCPP's efforts were unreasonable or lacking.

B.

Defendant contends the State did not prove he caused harm to Nick because there was no finding of abuse or neglect. He argues there is no causal link between the alleged harms referenced by the trial court — an unstable environment, substance abuse, lack of housing and mental health issues, and exposure to domestic violence — and harm to Nick. Adam claims Nick would not have been removed in June 2017, if DCPP provided him with housing assistance and referrals to other programs. He argues that by considering his lack of housing, the court improperly focused on his poverty. Then, when he lost housing, DCPP did not help him.

The harm necessary to prove prong one is not limited to physical harm; it includes a parent's inability to provide a safe, stable and permanent home for the child. See In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). This prong focuses "on the effect of harms arising from the parent-child relationship over time on the child's health and development." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The harm "must be one that threatens the

16

child's health and will likely have continuing deleterious effects on the child." Id. at 352.

In this case, there was substantial, credible evidence to support the trial court's finding that prong one was satisfied. Defendant never fully addressed his substance abuse issues; some of his tests were positive or he missed them. He did not successfully complete Drug Court. He did not effectively address his mental health issues. Adam's testimony and the evaluations conducted by Dr. Smith and Singer showed he did not take responsibility for his conduct. Dr. Singer testified that taking responsibility would have been the first step toward making changes. Defendant blamed poverty for his situation but the combination of drug use, mental health issues, and criminal activity showed it was these poor choices, in addition to poverty, that contributed to his unstable lifestyle. It was not necessary for the DCPP to show abuse and neglect in this case because it was brought under Title Thirty, not Title Nine. See N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009) (Title Thirty provides five statutory grounds for termination of parental rights, not just abuse and neglect).

A-3119-19

C.

Defendant argues there was no evidence he was unwilling or unable to correct the conditions that lead to Nick's removal. He contends DCPP did not refer him to services that would have helped such as housing assistance or employment where he could improve his education. He claims he addressed his substance abuse issues.

Under prong two of the best interests test, the DCPP must show a parent is unable or unwilling to correct the circumstances that led to its involvement. K.H.O., 161 N.J. at 348. "The question is whether the parent can become fit in time to meet the needs of the child." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010).

There was substantial, credible evidence to support the trial court's finding under prong two. The services provided by DCPP were those that were recommended by the psychologists. DCPP did refer Adam to a program that had a housing component and directed him to apply for rental assistance through welfare. Defendant did not rebut the experts for DCPP and the Law Guardian that defendant was not able to parent Nick at this time and would not be able to do so within a reasonable time.

18

D.

Adam argues the trial court erred in finding that termination of parental rights would not do more harm than good. He argues he is "committed to his son" and complied with services. The experts noted there was a bond between Nick and Adam. Dr. Singer never provided an updated bonding evaluation. Dr. Smith indicated Nick had attachments to both parents and foster parents. Defendant notes the resource parents did not testify at trial; only the DCPP caseworker testified that the resource parents were willing to adopt Nick.

In evaluating prong four, the trial court must balance the child's relationships with his birth and resource parents and determine whether he will suffer greater harm from the termination of ties with the former than with the latter. In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002). Prong four does not require that "no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. A court must consider "the child's age, her overall health and development, and the realistic likelihood that the [natural] parent will be capable of caring for the child in the near future." Id. at 357.

Here, the fourth prong of the best interests test was satisfied. Dr. Smith's opinion was that Nick's primary attachment was with his resource

parents and that termination of parental rights would not do more harm than good. Dr. Singer shared this opinion. The opinions by the experts were unrebutted, as were their views that defendant was unfit to parent and would not be capable to do so within the foreseeable future. There was testimony that the resource parents were willing to adopt and certainly took Nick back into their home when his placement in Ohio did not work out.

Adam is critical of the DCPP's proof because there was no first-hand testimony from the resource family about adoption. However, we are satisfied the record supported the availability of an adoption opportunity for Nick. Nick remained with the resource family for almost all the time he has been in placement. Adam never presented any evidence to the contrary about the supportive environment offered by the resource family.

After carefully reviewing the record and the applicable legal principles, we conclude that any further arguments by defendant are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3119-19