# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4514-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.M.,

     Defendant-Appellant,

and

S.D.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.D.,
a minor.

_____

Argued May 17, 2021 – Decided July 9, 2021

Before Judges Hoffman, Suter, and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0028-19.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Adrienne Kalosieh, on the briefs).

Meaghan Goulding, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Hannah F. Edman, Deputy Attorney General, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the brief).

PER CURIAM

Defendant S.M.[1] appeals the judgment terminating her parental rights to G.D. (George). She contends the trial court lacked substantial credible evidence to terminate her parental rights.[2] We affirm largely for reasons expressed in Judge Louise Donaldson's oral opinion.

---

[1] Fictitious names have been used throughout the opinion to maintain the confidentiality of the parties as permitted by Rule 1:38-3(d)(12).

[2] S.D. (Sam), George's father, did not appeal the termination of his parental rights.

## I.

Defendant and Sam are the biological parents of George, who was born on May 19, 2017. Their parental rights were terminated on July 30, 2020, following a multi-day bench trial.

When George was four weeks old, defendant noticed he was "fussy," crying, vomiting and had a fever. Defendant called 911 after Sam would not take them to the hospital because he had been drinking. Dr. Marita E. Lind, a board-certified pediatrician, examined George at the Children's Hospital of Philadelphia (CHOP) and saw bruising on his shoulder, thighs, ear and cheek. X-rays revealed distal metaphyseal fractures in both tibias (shin bones). Dr. Lind testified that injuries of that nature could not be caused by the child. They were consistent with non-accidental trauma.

Defendant was not certain how the injuries occurred. At first, she suggested they may have occurred when her mother was caring for the child. Later, she suggested, they may have occurred when she was in the shower and Sam was watching the child. Defendant acknowledged telling different versions about how the injuries may have occurred. She never explained the bruising. Just a few days later, Sam told defendant he injured George by accident after catching him by the legs as he was falling. None of this explained the bruising.

3

A-4514-19

DCPP removed George from defendant and Sam's custody because they would not say how the injuries occurred, and they did not identify relatives who could take responsibility for the child. George was placed with resource parents who, after the four years George has lived with them, want to adopt him.

On June 23, 2017, the Division of Child Protection and Permanency (DCPP) filed an order to show cause and verified complaint under N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12 alleging George was abused and neglected by his biological parents. DCPP requested protection, care and supervision of George.

On the return date of the order to show cause, defendant admitted she was not truthful about how George was injured, acknowledging that Sam accidentally caused the injuries. George remained in placement under DCPP custody. The court ordered services for both parents which included supervised visitation.

The January 2018 abuse and neglect trial resulted in a finding under N.J.S.A. 9:8-21(c) that Sam neglected George. The court found he disregarded "the likelihood he was impaired from alcohol intake which contributed to [him] injuring his child." Defendant was found to be unable to adequately care for George because "[s]he is part of a family in need of services" under N.J.S.A. 30:4C-12. George continued under DCPP custody and care. Both parents were

ordered to attend psychological evaluations. Sam was to attend a substance abuse evaluation. They continued to have supervised visitation.

For the next year, Sam sporadically complied with the services he received. The substance abuse evaluation showed he needed treatment, but he would not attend. He had supervised visitation with George but attended it irregularly. He had parenting classes which included anger management counselling, but he was disengaged from the process. He also received psychological evaluations and transportation assistance.

Defendant complied with the services she received, which included supervised visitation, parenting classes, psychological evaluations, counseling and bus passes. Although recommended, defendant did not meet with a domestic violence counselor because she denied domestic violence was occurring. The court denied DCPP's request to order domestic violence counseling. Defendant apparently benefited from the services, but she still needed assistance in caring for the child. DCPP explored, without success, whether other relatives could care for George or assist defendant. Defendant and Sam remained together as a couple.

In December 2018, the trial court approved DCPP's permanency plan, which was to terminate defendant and Sam's parental rights to George. DCPP

filed a guardianship complaint in January 2019. The trial commenced in August 2019. On July 30, 2020, the trial court ordered termination of defendant and Sam's parental rights to George, finding termination and the transfer of guardianship to DCPP was in George's best interest.

We summarize the trial evidence and findings by Judge Donaldson as necessary to address the points raised on appeal. In assessing witness credibility, the judge accepted the conclusions of the experts called by DCPP and the law guardian and reviewed their testimony in detail.

Dr. Brian Eig, an expert in clinical psychology, testifying for DCPP, conducted three psychological examinations of defendant — from February 2018 to April 2019 — in which he diagnosed defendant with a "generalized anxiety disorder and major depressive disorder." Because of this, her ability to meet George's needs or provide him a stable environment was limited, and it was not likely she could care for George by herself. She had dependent personality traits and needed to rely on others for care and guidance. She participated in the services recommended for her and made some improvements, but her relationship with Sam continued, which was "a significant liability." Dr.

A-4514-19

Eig testified that defendant was "minimally adequate as a parent. . . . a marginal parent," and he did not recommend reunification.[3]

Dr. Eig's bonding evaluation concluded George had an insecure attachment to defendant and there was only a low risk to the child if this relationship were severed. Dr. Eig reached a similar conclusion regarding George's bond with Sam, which he found to be of an "insecure avoidant" nature.

Dr. Eig testified that George had a "strong positive and warm relationship" and a secure bond with both resource parents. He concluded George would be at high risk of enduring severe emotional harm if he were separated from his foster parents. Dr. Eig concluded George's foster parents could ameliorate any harm caused by the termination of parental rights.

The court found that visitation with defendant and Sam affected George, who generally was happy and pleasant. After visitations, George was irritable and cranky, and at times "distressed and inconsolable . . . ." Defendant attended parenting classes but needed redirection concerning George's needs. The visitation coordinator testified that George was always excited to see defendant

_____

[3] We mention the psychological evaluation of Sam because defendant continued to reside with him. Dr. Eig found Sam had limited insight into his own difficulties. He had narcissistic personality traits, maladaptive patterns, and inflated self-esteem. He felt he was above the rules. Dr. Eig testified Sam could not parent a child on his own or benefit from services.

7

and said "I love you, Mommy" to her. However, defendant was easily distracted from watching the child and there were concerns about her ability to retain skills.

Defendant's visits were reduced to once a week because defendant missed several appointments. She said she missed some visits because she lacked funds. More recently, defendant acknowledged smoking medical marijuana while she was driving to visitation appointments.

In addition to Dr. Lind, who testified about the child's injuries, Dr. Maureen Santina testified on behalf of the law guardian as an expert in clinical and forensic psychology. Dr. Santina testified defendant intended to stay with Sam. Defendant's plan was to regain custody of George and then the two of them would raise him together. Dr. Santina diagnosed defendant as suffering from an anxiety disorder, panic disorder, and a dependent personality disorder. Defendant also expressed feeling depressed but Dr. Santina concluded that anxiety was "predominant." Defendant was unable to function independently or care for George now or in the foreseeable future. She was not living independently, she relied on others and had a pattern of unstable relations. Dr. Santina's bonding evaluation concluded George had an insecure attachment to defendant. However, George's bond with his resource parents was secure and

A-4514-19

positive. She testified there would be severe harm if that relationship were terminated, and the biological parents could not mitigate that harm.

Dr. Aida Ismael-Lennon testified for defendant as an expert in psychology. Her evaluation, based on a review of the records, was that "a strong positive bond" existed between defendant and George and that a "strong positive attachment" existed between George and his resource parents. Dr. Lennon learned that defendant had separated from Sam, concluding defendant was able to parent at a minimal level of capacity without Sam. He supported reunification with defendant even if that took longer than six months.

Judge Donaldson reopened the trial after closing arguments when defendant's attorney advised there was the possibility that defendant and Sam may separate. Defendant confirmed she no longer was living with Sam following eviction from their apartment. She was renting a room from her former public defender under a month-to-month lease. She agreed this was not a good location for the child. DCPP's inspection revealed heavy cigarette smoke and dog feces on the floor. Defendant denied she intended to reunite with Sam after the trial. She claimed to have a new boyfriend. Sam recently threatened to kill her, and she now claimed he verbally and emotionally abused her.

A-4514-19

Under prong one of N.J.S.A. 30:4C-15.1(a)(1) — harm to the child — the trial court found, based on Dr. Lind's testimony about the fractures sustained by George that "[t]he injuries to the child were caused either by both parents or more than likely by the father . . . ." Because Sam's anger management counselling was not successful, the court found there was no reason to think this type of behavior would stop in the future. Judge Donaldson found defendant was "unable to protect [George] and care for [him] and [it was] unlikely that she will be able to do so in the foreseeable future." This was because she stayed with Sam for two and a half years after the injuries and has a dependent-type personality. The judge noted defendant engaged in a series of "damaging relationships" and threatened to reconcile with Sam after the litigation was completed.

Under the second prong, the court found that defendant and Sam were unwilling or unable to eliminate the harms. The judge accepted the testimony of Drs. Eig and Santina that neither parent was capable of providing a stable home for the child. They were evicted even though their need for stable housing was an issue in this litigation for the past three years. Sam had anger management issues. Defendant was only minimally able to care for the child. The court expressed it was "seriously concerned" defendant would not be able

10

to protect George from Sam. George had been in the DCPP's custody for nearly three years by then and the resource family wanted to adopt him. The court found any delay in providing permanency for George was harmful to him.

Under prong three, the court found DCPP made reasonable efforts to provide services for both parents and to correct the reasons why George was in placement outside his home. DCPP had considered alternative placements for the child. After compliance with the services which had been ordered, defendant "still need[ed] assistance in caring for [George], which she [did] not have."

Under prong four, the trial court found the termination of defendant and Sam's parental rights will not do more harm than good. George is "clearly bonded" with the resource parents based upon the testimony of the psychological experts. The court found the need for permanency and a stable home to be central to its decision. The court further found the resource parents wanted to adopt George, and noted he has lived with them since he was one-month old. The expert witnesses testified that if the secure bond with his resource parents were broken, defendant would not be able to address the harms that will be caused. The court found that termination of parental rights was in the child's best interest.

A-4514-19

Defendant appeals the July 30, 2020 order terminating her parental rights.

On appeal, she raises the following issues:

> THE COURT ERRED IN HOLDING THAT DCPP MET ITS BURDEN UNDER N.J.S.A. 30:4C-15.1a AND THE JUDGMENT TERMINATING S.M.'S PARENTAL RIGHTS TO G.D. SHOULD BE REVERSED.
>
> I. THE JUDGMENT OF GUARDIANSHIP MUST BE REVERSED AS DCPP'S EVIDENCE DID NOT ESTABLISH S.M. WAS RESPONSIBLE FOR HARM TO HER CHILDREN AND COULD NOT CEASE DOING THEM HARM PURSUANT TO PRONGS ONE AND TWO OF N.J.S.A. 30:4C-15.1a.
>
> II. THE COURT ERRED IN HOLDING THAT TERMINATION OF S.M.'S PARENTAL RIGHTS WAS IN THE CHILDREN'S BEST INTERESTS BECAUSE DCPP FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT MET PRONG THREE, AND THE CASCADING EFFECTS OF THIS FAILURE IMPLICATED THE ANALYSIS OF PRONG TWO.
>
> III. THE COURT ERRED IN FINDING THAT DCPP MET ITS BURDEN AS TO PRONG FOUR BECAUSE THE EXPERT EVIDENCE WAS IN EQUIPOISE AT BEST THAT TERMINATION OF PARENTAL RIGHTS WOULD DO NO MORE HARM THAN GOOD.

II.

To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional and psychological harm to the child;

(3) The [DCPP] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence

in the record to support the court's findings." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

Defendant argues DCPP did not prove any of the four prongs of the statutory tests by clear and convincing evidence. We have carefully examined the record in light of the arguments posed, concluding that Judge Donaldson's findings were supported by substantial credible evidence in the record. We defer to those findings. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare, 154 N.J. at 413. We affirm substantially for the reasons set forth by Judge Donaldson in her oral decision, adding these comments.

A.

Defendant argues the trial court erred by finding DCPP met its burden under prongs one and two of the statute. She argues she did not harm George nor was she unwilling or unable to address any endangerments. She claimed she was capable of parenting on her own because Dr. Eig found her parenting was "minimally" adequate and Dr. Lennon agreed. Even though the experts claimed she would not separate from Sam, she did so in February 2020, removing the entanglement that was holding her back. She testified it was not her plan to reunite with him. She was working full-time and had a place to live.

The harm necessary to prove prong one is not limited to physical harm; it includes a parent's inability to provide a safe, stable and permanent home for the child. See In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). This prong focuses "on the effect of harms arising from the parent-child relationship over time on the child's health and development." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The harm "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." Id. at 352.

Under prong two of the statute, DCPP must show a parent is unable or unwilling to correct the circumstances that led to DCPP's involvement. Id. at 348. "The question is whether the parent can become fit in time to meet the needs of the child." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010).

DCPP proved that prongs one and two were satisfied.[4] The trial court found Dr. Lind's testimony credible that the injuries to George when he was only four weeks old were not the type to have occurred by accident. Defendant and Sam admit that Sam caused the injuries, although defendant contends they occurred by accident and not intentionally. Defendant was not truthful about

---

[4] We address prongs one and two together because defendant's brief combined them.

who injured George and how the injuries occurred. At first, she implicated her mother and not Sam. When she knew three days later that it was Sam, she did not tell. When she could no longer do that, she downplayed what had occurred. She continued to reside with Sam for the next two-and-one-half years even though he would not engage in substance abuse treatment and was not interested in the anger management counselling. They lacked stable housing and were evicted shortly before the guardianship trial was completed.

All this was with the knowledge that living with Sam was one obstacle to reunification with George. By the end of the trial, defendant had moved into a room in a place that even she admitted was not suitable for the child. The place was filled with cigarette smoke and there was dog feces on the floor. She shared the bathroom facilities with the other occupant, her former public defender. She admitted she would spend more money than she would earn each month. She still lacked a plan for a safe and permanent home.

Therefore, more than three years after George was removed, defendant still had not provided a stable home for him. A child's unfulfilled need for a permanent home is itself a harm under prong one of the statute. N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591 (App. Div. 1996). Defendant remained unwilling or unable to eliminate that harm.

Defendant complied with the services provided but the experts for DCPP and the law guardian testified she could not parent independently now or in the future. The trial court accepted this expert testimony as credible. Defendant needed constant assistance and redirection during her supervised visitation. She had a dependent type personality that resulted in bad relationships. At no time had defendant exercised unsupervised parenting time with George.

Defendant cites G.L, 191 N.J. at 596, for support. In G.L., a father was accused of shaking his child to death. Id. at 602-03. The child's mother was not involved but believed he only was responsible for failing to call for help when the child was in distress. Ibid. The mother's parental rights were terminated even though she participated in the services offered, separated from the father and never allowed him to have unsupervised visitation. Id. at 605. The Court concluded her failure to condemn the father's actions did not warrant termination of parental rights. Id. at 607.

G.L. is not this case. Defendant did not disclose Sam's actions even though he had told her. She stayed with Sam for three years while George was in placement even though he did not comply with services, and she understood he was one of the problems preventing reunification. Even when she did separate from him, it was at the end of the guardianship trial with no place that

was suitable for George. After the services provided to her, defendant at best exhibited minimal parenting skills and likely would re-engage in a harmful relationship.

We are satisfied there was substantial credible evidence in the record that the first two prongs of N.J.S.A. 30:4C-15.1(a) were satisfied by clear and convincing evidence.

### B.

Defendant contends the trial court erred by finding DCPP satisfied its burden of proving prong three by clear and convincing evidence and that this had "cascading effects" for prong two. Defendant contends DCPP failed to make "reasonable efforts" as defined by N.J.S.A. 30:4C-15.1(c) and that she was willing to attend other services to reunify with George. She argues DCPP failed to assist her in extricating her from her relationship with Sam. Defendant claims DCPP sent "mixed messages" to her by suggesting she and Sam attend couples' counseling.

The third prong of N.J.S.A. 30:4C-15.1(a) requires the State to make reasonable efforts by providing services to help a parent correct the circumstances that led to the child's outside placement. N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts must consider "the abilities and mental

18

conditions of the parents." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001). The Supreme Court has defined these reasonable efforts to include encouraging, fostering, and maintaining the bond between parent and child, promoting visitation, keeping the parent informed of the child's progress, and informing the parent of the measures he or she needs to pursue to strengthen the relationship and regain custody. D.M.H., 161 N.J. at 390. Reasonable efforts vary depending upon the circumstances. Id. at 391.

There was substantial credible evidence to support the trial court's finding that the third prong was proven by clear and convincing evidence. DCPP provided a host of services to defendant. She does not contest the necessity of the services, or the type of services provided. She does not contest the trial court's finding that DCPP made reasonable efforts to identify other relatives who could care for George.

Defendant does not dispute she was advised — repeatedly — that her relationship with Sam was one of the reasons against reunification. Defendant argues she was willing to leave Sam, but the record shows she repeatedly expressed her desire to stay with him. This prolonged and delayed permanency for George. Defendant and Sam never physically separated until they were

evicted in 2020. Although defendant denies that she intends to go back with Sam, that is not what she told others, including Dr. Santina.

Defendant had opportunities to separate from Sam. She had a therapist at the service provider to address her emotional issues. She received assistance through the Family Learning Center on housing and financial stability. She could have gone to Providence House for shelter but declined. She was not interested in meeting with a domestic violence liaison. The trial court's finding that the Division met the third prong of the best interest standard was well-supported by clear and convincing evidence in the record.

C.

Defendant argues the trial court erred by finding DCPP proved the fourth prong of the statutory test. She contends the expert testimony was at best in "equipoise" about the good to be served by termination of parental rights. Defendant argues there is a strong bond between George and defendant because he refers to her as "Mommy," and he shows difficulty separating from her at the end of the visits.

In evaluating prong four, the trial court must balance the child's relationships with his birth and resource parents and determine whether he will suffer greater harm from the termination of ties with the former than with the

20

latter.  In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002).  Prong four does not require that "no harm will befall the child as a result of the severing of biological ties."  K.H.O., 161 N.J. at 355.  A court must consider "the child's age, her overall health and development, and the realistic likelihood that the [natural] parent will be capable of caring for the child in the near future."  Id. at 357.

Here, the fourth prong of the statute was satisfied.  Defendant's characterization of the experts in equipoise is not supported by the record.  Drs. Eig and Santina were clear that there is an insecure bond between George and defendant.  They testified that if that bond were broken the harm would be something the resource parents could ameliorate because George is securely bonded with them.  George has been with his resource parents since he was four weeks old.  Even defendant's expert indicated that reunification would need to be implemented gradually over the course of six months to a year.  However, Drs. Eig and Santina testified that if the bond with the resource parents were broken, defendant would not be able to address the harms to George caused by this separation and that George was of an age that this break would have lasting consequences for him.

A-4514-19

After carefully reviewing the record and the applicable legal principles, we conclude that any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION