# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1540-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

        Plaintiff-Respondent,

v.

D.A.,

        Defendant-Appellant/
        Cross-Respondent,

and

L.A.,

        Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.E. and
H.E., minors,

        Cross-Appellants.

_____

<div style="border:1px solid black">

**APPROVED FOR PUBLICATION**

**October 25, 2023**

**APPELLATE DIVISION**

</div>

Argued September 27, 2023 – Decided October 25, 2023

Before Judges Rose, Smith[1] and Perez Friscia.

---

[1] Judge Smith did not participate in oral argument but joins the opinion with consent of the parties. R. 2:13-2(b).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0134-20.

Ryan T. Clark, Designated Counsel, argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Jessica Steinglass, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christina Duclos, Deputy Attorney General, on the brief).

Neha Gogate, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, of counsel and on the brief).

The opinion of the court was delivered by

ROSE, J.A.D.

Defendant D.A. appeals from a January 7, 2022 judgment of guardianship terminating her parental rights to her two biological children: I.E. (Isiah), born in August 2016; and H.E. (Helen), born in November 2017.[2] The judgment also terminated the rights of the children's biological father, L.A. (Lou), who was incarcerated at the time of trial and refused to appear. Lou does not appeal from

---

[2] Consistent with the parties' briefs, we use initials and pseudonyms to protect the confidentiality of these proceedings. R. 1:38-3(d)(12).

the judgment or otherwise participate in this appeal. Significantly, however, Lou's violent assaults against his biological son, S.E. (Sean), born in September 2007, underpin the precipitating event that led to the guardianship complaint. At that time, Sean, and Lou's biological daughter, H.E. (Hallie), born in July 2006, resided in Bayonne with defendant, Lou, Isiah, and Helen.[3]

Following a multi-day trial and written submissions of the parties, the judge issued a lengthy written decision finding the Division of Child Protection and Permanency satisfied all four prongs of the "best interests of the child" test, N.J.S.A. 30:4C-15.1(a)(1) to (4), by clear and convincing evidence. Accordingly, the judge held termination was in the children's best interests. See In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).

Defendant does not challenge the judge's conclusion that the Division satisfied the first prong, i.e., the "child[ren]'s safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). That determination was supported by "[t]he pervasive abuse that went on in the family home while I[siah] and H[elen] were present." Instead, defendant argues the judge erroneously determined the Division proved

---

[3] In March 2020, Sean and Hallie were returned to the custody of their biological mother, M.H., none of whom are parties to this appeal.

the remaining three prongs by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a)(2) to (4). Because Isiah has severe autism and special needs, defendant claims it is highly unlikely the Division will find him a permanent home and she is in the best position to care for both children.

The children's law guardian cross-appeals, challenging the second, third, and fourth prongs of the best interests test. The law guardian urges us to reverse the judgment because there is no viable permanency plan for the children and the judge relied on inadmissible hearsay testimony and lay opinion to find there were no alternatives to termination under prong three.

Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition supports the judge's finding that the Division established the challenged second prong, i.e., "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm," N.J.S.A. 30:4C-15.1(a)(2); and the first part of the third prong, i.e., "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home," N.J.S.A. 30:4C-15.1(a)(3). However, we cannot discern on this record whether the Division satisfied its burden to explore

alternatives to termination under the second part of the third prong, which in turn impacts the judge's finding on the fourth prong, whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Accordingly, we affirm in part, and reverse and remand in part for proceedings consistent with this opinion.

## I.

### A. The Evidence Adduced at Trial

The guardianship trial spanned six days during November and December 2021. The Division moved into evidence more than 100 exhibits and presented the testimony of five witnesses, including three caseworkers and an expert in psychology. Defendant did not testify but called her own psychology expert. On behalf of the children, the law guardian presented the testimony of another psychology expert. Defendant and the law guardian moved into evidence their experts' reports; the law guardian submitted various reports on behalf of Isiah. The voluminous evidence adduced at trial was discussed in the judge's opinion and need not be repeated in the same level of detail. We recount the most significant evidence to provide context to the issues raised on appeal.

On March 21, 2019, eleven-year-old Sean was admitted to the Jersey City Medical Center with life-threatening injuries, including "a subdural hematoma

with severe brain bleeding" that required emergency surgery. Sean's doctors noted the child's injuries were in various stages of healing and were inconsistent with Lou's account that Hallie had pushed Sean into the wall the evening prior to his hospitalization.[4]

Initially claiming Lou was not home when the incident occurred, defendant said Hallie "beat[] S[ean] with the [phone] charger," then pushed him. Defendant later changed her story, asserting: Lou was asleep at the time of the incident; when Lou awoke, he fed Sean; and the couple then put Sean to bed. The following morning, defendant remained home while Lou went to work. Defendant said she attempted to wake Sean at 11:00 a.m. and 1:00 p.m., but both times "he was unresponsive." Defendant called Lou, who picked up Hallie at school before arriving home.[5] Emergency services were not called to the home

---

[4] Following his admission, the hospital registered Sean on an organ donation list. Although Sean survived, his treating physicians reported the child would experience problems communicating, eating, walking, and breathing. Accordingly, Sean would require multiple surgeries, hospitalization, and long-term care.

[5] Although Hallie initially claimed she hit Sean, she ultimately acknowledged Lou physically abused Sean on the night in question and had abused Sean in the past. Hallie feared future abuse by Lou and defendant.

until nearly 3:00 p.m.  Police observed "blood on the wall and many droplets of blood on the floor and in the tub."[6]

The following day, defendant and Lou were arrested and charged with child endangerment and related offenses.  They were remanded to the county jail, prompting the Division to conduct a Dodd removal[7] of Hallie, Isiah, and Helen.  Pertinent to this appeal, the court awarded the Division care, custody, and supervision of Isiah and Helen.  Diagnosed with autism, Isiah's behavior made placement difficult.  After a series of four brief placements, including relatives, friends, and non-relatives, on July 8, 2019, Isiah and Helen were placed with their current non-relative resource parent, who does not wish to adopt or participate in kinship legal guardianship (KLG).

---

[6] Inexplicably, defendant and Lou recorded the abuse inflicted on Sean.  During the criminal investigation that followed, police extracted various videos and photographs from defendant's and Lou's cell phones.  The images depicted the injuries to Sean's entire body, welts and swelling on his face, and blood on his clothing.  The other children are visible in the background of some of the videos. The Division moved several images into evidence at trial.

[7] A Dodd removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act.  See N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).  Sean was hospitalized at the time of the removal.

A-1540-21

Defendant and Lou were released from jail ten days after their arrest. The Division's initial plan was reunification. The Division offered defendant psychological and parenting evaluations, but her attorney advised against completing the evaluations in view of the pending criminal charges.[8] Accordingly, the Division was unable to effectuate services based on defendant's specific needs until the criminal matter was resolved.

In the meantime, the Division explored placement of the children with relatives in the United States if reunification did not occur, including reassessing the relatives with whom the children briefly lived following their removal. All relatives residing in this country were ruled out. Defendant also proposed her parents in Dubai, an emirate within the United Arab Emirates (UAE). In August 2019, the Division made a referral to International Social Services (ISS) for an in-home study; ISS thereafter approved the maternal grandparents' home. Through ISS, the Division requested a child resource study and contacted an autism center in Dubai to address Isiah's needs.

The Division provided defendant liberal supervised visitation with the children. Although defendant spoke English and was able to communicate with

---

[8] Lou similarly declined services. Because Lou does not appeal from the judgment, we focus instead on the Division's efforts regarding defendant.

A-1540-21

the caseworkers, the Division made available an Arabic interpreter for meetings and defendant's ensuing psychological evaluations. Notably, defendant did not need housing assistance or transportation services, but the Division transported defendant to the hospital for one of Isiah's procedures.

The Division also offered services for the children tailored to their needs, including medical consultations and evaluations, play therapy, and daycare. Although Helen was assessed by the early intervention program, she was deemed ineligible for services. Diagnosed with autism spectrum disorder, expressive language delay, and adjustment disorder, Isiah had difficulty sleeping, threw tantrums, hit his head on objects, and bit himself and others. The Division therefore referred Isiah to early intervention, speech therapy, and applied behavioral analysis (ABA) therapy.

At trial, however, the adoption caseworker acknowledged the Division did not provide ABA therapy until it was court ordered, and two years had transpired before the therapy was implemented. The worker attributed the delay to the Department of Developmental Disabilities, which was required to approve the service prior to implementation by the Division. By the time of trial, all of Isiah's court-ordered services were in place.

A-1540-21

Defendant attended most of Isiah's therapy appointments, was in regular contact with Isiah's nurse, and attended his neurological evaluations. Defendant's visits with the children were positive; there were no issues or problems noted. Defendant also maintained a good relationship with the resource parent.

Following a March 2, 2020 fact-finding hearing, the same judge who later conducted the guardianship trial concluded defendant and Lou abused or neglected the children. On March 13, 2020, defendant's mother arrived in the United States from Dubai.

As part of the Division's planning, on April 20, 2020, the adoption caseworker, Mariam Attia, met virtually with unspecified attorneys in Dubai. One week later, the judge approved the Division's plan of termination of parental rights followed by adoption. A few months later, defendant told the worker she had filed for divorce from Lou, blaming him for her loss of custody.

On November 13, 2020, defendant pled guilty to second-degree endangering the welfare of a child for her part in the abuse inflicted on Sean. During her plea colloquy, defendant acknowledged she failed to call for medical assistance after Lou severely injured Sean. A non-citizen of the United States, defendant acknowledged her guilty plea could result in deportation. Sentencing

was scheduled for January 15, 2021; defendant was accepted into the pretrial intervention program.[9]

Following disposition of defendant's criminal charges, the Division scheduled her psychological evaluation at the Audrey Hepburn Children's House (AHCH). In March 2021, defendant was referred to Wafa House, an organization that provides therapeutic services to mostly Arabic-speaking families. Defendant's referral included domestic violence and parenting counseling. By the time of trial, defendant's services remained ongoing.

At the time of trial, the Division's plan for the children was termination of parental rights followed by placement with their maternal relatives in Dubai. Concurrently, the Division was exploring select home adoption.

Prior to the start of trial, the Division moved to "bifurcate" the proceedings "in an effort to try to fully explore the possibility of transferring custody to the[] relatives in Dubai." The Division sought findings on prongs one and two only. Defendant, Lou, and the law guardian opposed the application. Noting defendants were unwilling to consent to the transfer of custody, the judge denied the Division's novel application.

---

[9] On the same day, Lou pled guilty to two counts of endangering the welfare of a child and was thereafter sentenced to an aggregate ten-year prison term.

At trial, Attia testified that based on the Division's understanding "from the various meetings with the consulate, as well as the attorneys in Dubai," adoption by the maternal relatives was not a viable option for the children. The law guardian objected, asserting the "question asked for a legal expert opinion." The judge sustained the objection on that ground and because the testimony constituted hearsay. Nonetheless, the judge permitted the caseworker to testify that Dubai law allowed "a custody arrangement." The judge overruled the law guardian's renewed objection, concluding: "Layperson[s] can know that information also." Attia thus testified Dubai required a "report indicating that mom cannot currently care for H[elen] and I[siah]," and defendant's consent "to transfer custody to [L.A., (Laura), the maternal aunt]."[10]

By the time of trial, however, both parents had refused to give their consent, and proposed return of the children to defendant. Attia acknowledged that should the court terminate parental rights in this case – and the parents continued to withhold consent – the Division would contact the Dubai attorney "to figure out how to do a custody arrangement without [defendant's] consent."

---

[10] Around March 2021, the maternal grandmother became ill and Laura, who resided with her parents, offered herself as an additional support for the children.

In the alternative, the Division's plan for the children was select home adoption. However, Attia acknowledged it would be difficult to place Isiah in an adoptive home in view of his behavioral issues. The Division had not begun searching for a select home because the Division "cannot work on the select home goal" when placement with relatives has not been ruled out.

Dr. Brett A. Biller, Psy.D., testified for the Division. As the mental health director of AHCH, Dr. Biller supervised the clinicians who conducted interviews, performed testing, and prepared reports for the Division. Dr. Biller reviewed the recommendations and co-signed the reports. Defendant submitted to two evaluations, by two different evaluators, each conducted over the course of two non-consecutive days between January 2021 and October 2021.

Dr. Biller explained the test results administered to defendant. He noted defendant deliberately presented herself in an overly positive fashion, which invalidated some of the testing including the child abuse potential inventory. For example, defendant displayed rigid parenting beliefs and an expectation of compliance with those beliefs. Further, she "demonstrate[d] profound and significant parental risk factors," i.e., "lack of insight and . . . lack of judgment" concerning the harm she caused Sean. Defendant blamed the Division, Lou, Sean, and Hallie, for the removal of Isiah and Helen. Yet defendant described

13

Lou as "good-hearted" and "giving." Notably, defendant denied she witnessed any violence in the home. When shown the video of her laughing at Lou's abuse of Sean, defendant claimed she was laughing "to protect her children" by distracting them from the abuse.

The second evaluation was conducted after defendant had engaged in months-long therapy, yet she continued to minimize the situation that led to the removal of the children and her role in Sean's injuries. There was "no indication" that defendant demonstrated any personal gain since the first evaluation. Although she finally acknowledged she feared Lou and that he caused Sean's injuries, she failed to take any responsibility for Sean's injuries and continued to lack understanding about the impact of that abuse on Isiah and Helen. Defendant claimed she would protect her children but could not explain how she would do so. Accordingly, AHCH was concerned about defendant's ability to empathize with children and understand their experiences.

Dr. Biller noted defendant cited her cultural differences to rationalize her behavior, but he explained that the AHCH psychologists considered those differences when conducting their analyses. He also acknowledged defendant: participated in services; was employed; filed for divorce from Lou; expressed concern that Isiah had not been receiving proper services since his removal; and

believed she could provide a higher level of care to Isiah if the children were returned to her custody.

Nonetheless, Dr. Biller opined that as of October 2021 – when the second evaluation had been concluded – defendant "was not yet able to safely parent her children unsupervised." AHCH further expressed concerns that defendant would attempt to influence the children's recollection of their home life "to enhance her best interests."

AHCH recommended that the Division concurrently work toward reunification and termination of parental rights. Dr. Biller explained AHCH "always will advocate for reunification when it's . . . [in] the best interests of the children." Citing concerns for stability and permanency, however, Dr. Biller testified the need to consider "different permanency options." He further stated defendant should continue to receive the recommended services to determine whether she made therapeutic progress and to assist her if her parental rights were terminated.

Dr. Maha Younes, Ph.D., a psychologist and native Arabic speaker, testified on behalf of the children. Dr. Younes conducted an evaluation of defendant and bonding evaluations between her and the children in October and December 2020, which were updated in October 2021.

15

Dr. Younes opined that this matter must be evaluated through the lens of cultural competency. She testified about defendant's history, noting she was born in Palestine, lived in Dubai, her first marriage ended in divorce, and she emigrated to the United States to marry her cousin, Lou. Further, from a cultural standpoint, in Middle Eastern countries, the man is the head of the household and his authority is undisputed. Any problems with defendant's second marriage also would be considered a negative reflection on her. Defendant was expected to respect Lou and refrain from interfering with his parenting of Sean and Hallie because she is their stepparent. By contrast, defendant could express her opinion about Lou's treatment of her biological children. Dr. Younes testified defendant did nothing to help Sean from an "American perspective" because she did nothing to intervene when Lou was abusing Sean.

Citing the test results performed on defendant, Dr. Younes testified defendant was less anxious and depressed after she distanced herself from Lou and took more responsibility for her part in the harm that befell the children. In addition, defendant's understanding of her role in the family had become more in line with "the laws of the United States." Defendant's test results did not indicate any tendencies toward abusing children.

A-1540-21

During the first round of bonding evaluations, Isiah was unable to interact. However, during the second round, Isiah was very attached to, and physically affectionate with, defendant. Helen also engaged with defendant and even called her, "mommy." Neither child wanted to separate from defendant at the end of the evaluation. During the interactions, defendant was appropriate, positive, and encouraging. Dr. Younes opined defendant and the children were "extremely well-bonded," and defendant was "quite capable" of parenting both children.

Dr. Gerard A. Figurelli, Ph.D., an expert in psychology testified for defendant. Dr. Figurelli conducted evaluations of defendant in September 2020, October 2020, and August 2021, and performed his bonding evaluation with the children in October 2020.

Dr. Figurelli diagnosed defendant with anxiety, depression, and dependent personality traits. However, she was not dependent on any substances and did not have any cognitive defects. Through therapy, defendant learned how to defend herself and protect her children from abuse. She also learned how to parent successfully. However, Dr. Figurelli recognized Isiah's autism was "quite severe," which would create challenges and require defendant to undergo additional parental training. Dr. Figurelli opined the bond between defendant

17

and Helen was "significant" and "intact," and the bond between defendant and Isiah was emotional and worth preserving.

## B.  The Trial Judge's Decision

In her written decision, the judge addressed the governing legal principles in view of the evidence presented at trial, finding the Division satisfied all four prongs of the "best interests of the child" test, N.J.S.A. 30:4C-15.1(a)(1) to (4) by clear and convincing evidence.  Assessing the credibility of the experts, the judge "f[ound] Dr. Biller's testimony to be the most credible and persuasive of all the expert witnesses."  The judge elaborated:

> The other experts downplayed [defendant's] role in the abuse and lost credibility when they claimed not to have seen [defendant] strike S[ean] with a partially full gallon of milk despite claiming that they watched the video.  Upon observing the video admitted into evidence, this [c]ourt has no doubt that she st[r]uck him with it to which he recoiled.

The judge also found Dr. Younes "the least credible of all the experts." Noting the expert did not watch any of the videos, the judge discredited Dr. Younes's opinion that defendant's involvement or lack of involvement in her stepchildren's abuse had any bearing on defendant's "ability to parent her own children."  The judge further found the expert's opinion was based primarily on

the information defendant disclosed to her. The judge "observed the witness to be defensive and evasive on cross-examination by the Division."

The judge's credibility assessment of the experts informed her decision on prong two. Referencing Dr. Biller's testimony, the judge was persuaded "the same risk factors remained" even though defendant was afforded therapeutic services between both AHCH evaluations. The judge further noted: "Even Dr. Figurelli could not project[] when [defendant] would be ready for reunification."

The judge found the Division proved it made reasonable efforts to reunify the family under prong three. The judge detailed the Division's efforts "to provide services to the family beginning with the [Title 9] litigation," but noted defendant "refused to comply with psychological evaluations" while her criminal charges were pending. Thereafter, the Division referred defendant to Wafa House for therapeutic services. Although defendant had been attending those services since March 2021, the judge noted she had not "demonstrate[d] any progress as of her AHCH reevaluation in October 2021." The judge also rejected the law guardian's argument that insufficient services were provided to the children. Noting the Division's statutory obligation under prong three is "to assist the defendants in remedying the circumstances that led to placement of

19

the children," the judge nonetheless summarized the services the Division provided to Isiah and Helen.

The judge recognized "the Division's plan [was] to conduct a more extensive search for a select home to adopt the children while continuing to work with the relatives in Dubai." Regarding the second part of prong three, the judge found the Division explored and ruled out placement with relatives in the United States, but the maternal relatives residing in Dubai "have not been ruled out." Nonetheless, the judge concluded, "There are no alternatives to termination of parental rights." The judge explained:

> Dubai will not recognize adoption or KLG but will recognize placement if the parents[] consent, which they have refused to give[,] and . . . the [c]ourt finds the children were abused and it is not safe to return the children to them. The children cannot continue to languish in a foster home that does not wish to be a permanent placement for them.
>
> . . . .
>
> While there is an alternative to termination of parental rights placement with the relatives in Dubai, that option is only feasible if there is consent by the parents. Absent consent, there is no alternative.
>
> [(Emphasis added).]

Finally, the judge found the Division proved the fourth best interests prong. Citing the testimony of the competing experts, the judge concluded:

A-1540-21

Both children have remained in foster care since March 2019. Neither parent has corrected the reasons for the removal as stated throughout this decision. Despite the fact that Dr. Younes found that during the second bonding evaluation, H[elen] called defendant "mommy" and was "more engaged with her mother" and comfortable than the initial bonding evaluation, this can hardly be called a secure bond which if severed would do more harm than good. Likewise, I[siah] was "so attached" to his mother that the expert was surprised. How much of this is merely a comfort level with her as a familiar figure is unknown. The expert concluded that [defendant] was "well bonded" with her children. The [c]ourt has no doubt that [defendant] loves her children and desperately wants to be reunified with them but as Dr. Biller testified [defendant] has a poor prognosis for any meaningful change now or in the foreseeable future. Furthermore, it is unknown if or when she will be able to safely parent her children. Thus, as explained by Dr. Biller and found persuasive by this court she continues to pose a risk to their safety due to her lack of insight and judgment. It is in their best interest that termination be granted so that they can achieve permanency.

[(Emphasis added).]

## C. Post-Judgment Applications

Following the trial judge's decision, the matter was transferred to the Child Placement Review docket (FC matter). This appeal and cross-appeal followed.

In June 2022, we granted defendant's emergent application for leave to appeal from the denial of her motion to intervene in the FC matter. We then summarily reversed the FC judge's decision, noting defendant "has court-

21                                                    A-1540-21

ordered visitation nine hours per week," and the children "wish to continue contact with their mother, but if the Division . . . prevails in its application, the children would be placed outside the country."  Accordingly, we held defendant had standing to intervene in the FC matter.

In July 2022, the law guardian moved to remand the present appeal to the trial court so the children could move to vacate the January 7, 2022 judgment under Rule 4:50-1.  The law guardian asserted:  "Three months after the judgment of guardianship was issued, the Division represented to the [FC] court new information that parental consent is not required to transfer custody to L[aura] in Dubai, UAE, and sought an order granting legal and physical custody of [the children] to her."  The law guardian thus argued a remand would permit the trial court "to consider the current information relevant to its determination to terminate [defendant]'s parental rights and the decision of whether custody should be transferred to the maternal aunt in the UAE in the children's best interest."  The law guardian noted just prior to commencement of trial, the Division was willing to bifurcate the trial to obtain a finding on the first two prongs to attempt to obtain a custody transfer to Dubai in lieu of termination of defendant's parental rights, but the judge was unwilling to do so because

defendant did not consent to the transfer. As stated, however, both defendant and the law guardian opposed the Division's pretrial application.

Defendant opposed the law guardian's remand motion, seeking instead "a full remand after reversal of the [j]udgment" by this court. Defendant maintained she opposed placement outside the United States, contending she would never see her children again, thereby constituting a "de facto termination of [her] parental rights because the UAE is not even a signatory to the [Hague Convention on the Civil Aspects of International Child Abduction]."

The Division also opposed the law guardian's motion but cross-moved to stay the appellate proceedings pending the FC court's hearing on its application to transfer custody to the maternal aunt in Dubai. We denied both motions.

Following a plenary hearing, the court in the FC matter denied the Division's application to transfer custody. According to its October 3, 2022 order, the court concluded it was not in Isiah's best interests to be moved out of the country "at this time pending appeal."[11] (Emphasis added).

---

[11] The parties did not provide a transcript of the plenary hearing or the FC court's decision.

## II.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We will uphold the court's factual findings if they are "supported by adequate, substantial, and credible evidence." Ibid. "Concomitantly, reviewing courts should defer to the trial court's credibility determinations." Ibid. We do so because the court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)). Our Supreme Court has reiterated "a trial court's factual findings [in a guardianship action] 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). However, we review the trial court's legal interpretations de novo. R.G., 217 N.J. at 552-53.

### A.  Prong Two and Prong Three-Part One

Having reviewed the record with these standards in mind, we find no merit in the arguments raised by defendant or the law guardian concerning the second

24

prong and the first part of the third prong of the best interests test. We are satisfied that the trial judge's factual and credibility findings as to these prongs are supported by substantial credible evidence in the record, and her thorough opinion amply addressed the issues. See R.G., 217 N.J. at 552. Defendant's inability to eliminate the harm facing her children cannot reasonably be attributed to any alleged deficiency on the part of the Division. The record demonstrates the Division made reasonable efforts to provide services, facilitate visitation, and address the children's needs. We therefore affirm the judge's findings under these prongs for the reasons set forth in her written decision.

### B. Prong Three-Part Two and Prong Four

We part company, however, with the trial judge's findings on the second part of the third prong and her conclusion that termination of defendant's parental rights "will not do more harm than good" under the fourth prong. We do so for procedural and substantive reasons.

Initially, the judge's conclusion that there are no alternatives to termination under the third prong was based on incompetent hearsay and lay opinion adduced by the Division on direct examination of the adoption caseworker. Over the objection of the law guardian, Attia testified about the Division's understanding of UAE law, which was based on conversations with

25

"the consulate" and "attorneys in Dubai." The judge correctly sustained the law guardian's objection because the Division's question called for an expert legal opinion and hearsay. Nonetheless, the judge cited that same incompetent testimony to conclude that "Dubai will not recognize adoption or KLG but will recognize placement [only] if the parents[] consent."

Although a trial court's evidentiary decisions are reviewed under the abuse of discretion standard, N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017), and the danger of hearsay is mitigated in a bench trial, N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016), the admission of Attia's testimony constituted harmful error here. Indeed, the feasibility of adoption or a KLG-type arrangement under UAE law is best elicited through expert testimony pursuant to N.J.R.E. 702. Attia's testimony was not based on her perception, see N.J.R.E. 701, and reiterated statements made by out-of-court declarants, see N.J.R.E. 801(c). Accordingly, we conclude the judge's prong three determination improperly relied on incompetent evidence.

Moreover, it appears the testimony elicited by the Division at trial may not have been accurate. Post-judgment, the Division has been exploring placement with the maternal relatives in Dubai – in the absence of defendant's

consent. Indeed, the FC court denied the Division's application while this appeal was pending. As in N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 247 (App. Div. 2010), we recognize our review of the trial judge's decision in this case has been "aided by the benefit of time." Similar to that matter, where a culmination of events post-judgment caused us to question an otherwise sound decision by the trial court terminating a parent's rights, see id. at 249, here the criteria for placement in Dubai appears to be at odds with the evidence presented at trial, i.e., that defendant's consent was necessary for the children's placement with the maternal relatives in Dubai.

Our jurisprudence recognizes two permanency options: KLG and adoption. P.P., 180 N.J. at 507-08 (citing N.J.S.A. 3B:12A-1). Under the second part of prong three, KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver. See N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-25 (2010) (discussing the KLG Act and its intent). In the present matter, because the Division's plan appears to be a form of KLG, the Division has not clearly and convincingly proven all alternatives to termination have been ruled out.

Although we do not find the judge's finding on prong four "wide of the mark" as of the time of the decision, in this unusual factual context, we must reverse and remand as to prong four and the portion of prong three requiring the court to consider alternatives to termination. The post-judgment developments require a fresh inquiry. See T.S., 417 N.J. Super. at 249-50 (remanding for a prong four inquiry based on post-trial developments). On remand, the judge should consider whether adoption or a KLG-type custodial arrangement with the maternal relatives in Dubai is feasible under UAE law after considering the testimony from a qualified expert; and whether, under the current circumstances, termination would not do more harm than good.

In reevaluating the second part of prong three, and prong four, the trial judge is not foreclosed from considering whether defendant has continued therapeutic services and whether she could safely parent the children in the foreseeable future. We also leave to the judge's sound discretion whether updated psychological evaluations and fresh testimony is required to assess defendant's present ability to parent, and whether the evaluations or testimony warrant a reassessment of prong two. See K.H.O., 161 N.J. at 348 (holding the four prongs of the best interests test "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that

28

identifies a child's best interests"). However, we do not suggest a preference either regarding whether to adduce further evidence or in the ultimate result.

In conclusion, we affirm the trial judge's decision as to prong two and the first part of the third prong of the best interests test. Because the Division did not present competent evidence regarding the second part of the third prong, we cannot determine whether the Division has demonstrated there are no alternatives to termination or that termination would not do more harm than good under the fourth prong.

Accordingly, we remand the matter to the trial court to reopen the FG matter for further proceedings consistent with this opinion. The remand proceedings shall be conducted expeditiously.

Affirmed in part; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1540-21